1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    : 22-CR-106(LDH)
                             :
                             :
                             :
                             :
                             : United States Courthouse
    -against-                : Brooklyn, New York
                             :
                             :
                             :
                             :
                             : Friday, June 14, 2024
JONATHAN GOULBOURNE,          : 12:00 p.m.
                             :
        Defendant.           :
                             :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                       BY: TARA B. MCGRATH, ESQ.
                            REBECCA SCHUMAN, ESQ.
                            Assistant United States Attorneys

For the Defendant:     SHER TREMONTE, LLP
                       Attorneys for the Defendant -
                       Jonathan Goulbourne
                            90 Broad Street
                            23rd Floor
                            New York, New York 10004
                       BY: NOAM BIALE, ESQ.
                            MARTIN NJORGE, ESQ.

2

A L S O   P R E S E N T:


UNITED STATES PROBATION DEPARTMENT
Eastern District of New York
75 Clinton Street
Brooklyn, New York 11201
BY: MICHELLE B. MALKO, U.S.P.O.


Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter
Telephone: (718) 613-2487
Facsimile: (718) 613-2694
E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

1          (In open court.)

2          (Defendant enters the courtroom at 12:27 p.m.)

3          COURTROOM DEPUTY:  Good afternoon.  This is a

4     criminal cause for a sentencing in the matter of

5     United States v. Jonathan Goulbourne.  Docket No. 22-CR-106.

6     Counsel state your appearances for the record.

7          MS. MCGRATH:  Tara McGrath and Rebecca Schuman for

8     the Government.  And we are joined at counsel's table by

9     Probation Officer Michelle Malko.

10          THE COURT:  Good afternoon to you.

11          MR. BIALE:  Noam Biale and Martin Njorge on behalf

12     of Mr. Goulbourne who is standing to my right.  And I want

13     to acknowledge we had some introductions of folks in the

14     gallery.  But since then, we've been joined by

15     Mr. Goulbourne's son Jamari Goulbourne.

16          THE COURT:  Good afternoon to you all.  You all

17     may be seated.

18          All right, folks, we are here today for a

19     sentencing determination on the superseding indictment

20     against the defendant Mr. Jonathan Goulbourne.

21          Now, present today are counsel for both the

22     Government and the defendant.  The defendant,

23     Mr. Goulbourne, of course, and a representative from the

24     probation department, each of whom have noted their

25     appearance for the record.

1          Now, on December 21st of 2023, Mr. Goulbourne

2   pleaded guilty to Count Fourteen of the superseding

3   indictment filed on June 15, 2022.

4          Now, Count Fourteen charges that on or about

5   February 10, 2022, within the Eastern District of New York

6   and elsewhere, the defendant Jonathan Goulbourne also known

7   as "Bobcat" did knowingly, intentionally, and corruptly, A,

8   alter, destroy, mutilate, and conceal one or more records,

9   documents, and other objects to wit:  A cellular telephone

10  with international mobile equipment identity numbers

11  354660119232414 and the files contained therein and attempt

12  to do so with intent to impair such item's integrity and

13  availability for use in an official proceeding to wit:  A

14  proceeding before a federal grand jury in the Eastern

15  District of New York relating to the commission and possible

16  commission one or more robbery, drug, and firearm offenses.

17         And B, obstruct, influence, and impede an official

18  proceeding to wit:  The grand jury investigation and attempt

19  to do so in violation of 18 U.S.C. Sections 1512(c)(1) and

20  (c)(2).

21         Now, the Court found that Mr. Goulbourne made his

22  plea knowingly and voluntarily and that there was a factual

23  basis for Mr. Goulbourne's plea.  Accordingly, the Court

24  accepted Mr. Goulbourne's plea of guilty on January 9th of

25  2024.

1              Now, in advance of this proceeding, I received and

2     I reviewed a February 10, 2022, second amended complaint and

3     affidavit in support of arrest; a June 15, 2022, superseding

4     indictment; a May 10, 2024, presentence investigation

5     report; a June 2, 2024, sentencing memorandum by the

6     Government; a June 7, 2024, addendum to the presentence

7     investigation report; and a June 7th sentencing memorandum

8     by the defendant as well as a June 13, 2024 supplement to

9     the sentencing memorandum filed by the defendant.

10             In addition, moments ago, the Court received from

11    the Government some additional materials that appear to be

12    medical records.  I have not had an opportunity to review

13    these records at all.  There are two flags, but I have no

14    doubt that the Government will indicate the import of these

15    documents as we move along.

16             Does the Government have any additional materials

17    they'd like to put before the Court at this time?

18             MS. MCGRATH:  No, your Honor.

19             THE COURT:  Mr. Biale, do you have any other

20    documents or submissions for the Court?

21             MR. BIALE:  So, your Honor, there is one thing

22    left off the list which was a June 9th, I believe,

23    supplemental letter from Mr. Goulbourne's sister Geneva

24    which I just received after filing the sentencing

25    submission.

*Sentencing*                                                              6

1          THE COURT:  Do you have a copy of it on hand?

2          MR. BIALE:  Yes.

3          THE COURT:  It was attached to -- hold on, let me

4    just make sure.

5          One moment, please.

6          To the Government, do you have any witnesses

7    present in the courtroom today?

8          MS. MCGRATH:  No, your Honor.

9          THE COURT:  Now, we had at one time anticipated

10   holding an Fatico hearing.  My understanding is that the

11   bases for that Fatico hearing, which was the objection by

12   Mr. Goulbourne, has been withdrawn and we are moving forward

13   without the Fatico hearing.  So the Court will accept the

14   factual allegation as asserted in the complaint with respect

15   to Paragraph 4 and the gun as it's set out in the PSR; is

16   that correct?

17         MR. BIALE:  That's correct.

18         THE COURT:  Okay.

19         MR. BIALE:  Your Honor, just one other

20   housekeeping matter.

21         Regarding the letter that I filed on June 13th

22   about the recent events at the MDC.

23         THE COURT:  Yes.

24         MR. BIALE:  So I have learned, since I filed that

25   letter, that the individual who had a heart attack was

1  thought to have died but actually is in critical condition

2  but still alive.  The individual who was stabbed did pass

3  away but I just wanted to --

4         THE COURT:  Clarify.

5         MR. BIALE:  -- clarify that.

6         THE COURT:  Okay.  Thank you.

7         MR. BIALE:  And, your Honor, Mr. Goulbourne just

8  informed me that the individual who was stabbed to death is

9  his friend's son who he knows well.  He grew up with this

10 individual's father, and so, he knows the victim of that

11 incident.

12        THE COURT:  I'm sorry for your loss,

13 Mr. Goulbourne.

14        Now, Mr. Biale, have you and Mr. Goulbourne had an

15 opportunity to read and discuss the presentence report?

16        MR. BIALE:  We have.

17        THE COURT:  And you've discussed the objections

18 that were raised to the presentence report both in your

19 submission to the Court and to the probation department?

20        MR. BIALE:  Yes, your Honor.

21        THE COURT:  Do you have any witnesses that are

22 present here today?

23        MR. BIALE:  No.

24        THE COURT:  And I am correct that with respect to

25 paragraph -- having resolved the objection, in effect, you

1   are withdrawing it with respect to Paragraph 4.  There's no

2   need for a Fatico hearing in this case?

3          MR. BIALE:  Correct, your Honor.

4          THE COURT:  Now, beyond Mr. Goulbourne who, of

5   course, will have an opportunity to address this Court, will

6   there be anyone that will be making a statement today?

7          MR. BIALE:  No, we just ask the Court, and I know

8   you have, to take the letters on behalf of Mr. Goulbourne's

9   supporters as those statements.

10         THE COURT:  Yes, I have and I will.

11         Let me talk about the maximum sentence available.

12         So with respect to Count Fourteen, the maximum

13  term of imprisonment is 20 years.  For Count Fourteen, the

14  Court may impose a supervised release of not more than three

15  years.  Because Count Fourteen is a Class C Felony, the

16  defendant is eligible for not less than one, nor more than

17  five years of probation.  However, one of the following must

18  be imposed as a condition of probation unless extraordinary

19  circumstances exist and that includes a fine, restitution,

20  communicate service.

21         Now, the maximum fine is $250,000.  The Court must

22  impose a $100 mandatory special assessment.  Now, based on

23  the count of conviction, restitution is not applicable here.

24  However, there is forfeiture that is set out in the plea

25  agreement which the Court will order accordingly.

*Sentencing*                                                    9

1           Now, the PSR calculates an effective guideline

2    range of 78 to 97 months' imprisonment and a total offense

3    level of 27 and a Criminal History Category of II.

4           There are some objections to the PSR, though, none

5    to the guideline ranges as set out in the PSR, correct?

6           MS. MCGRATH:  Yes, your Honor.

7           THE COURT:  So I'm going to walk through some of

8    these objections and I'm using the addendum to the

9    presentence report as a reference point if you all want to

10   follow along with me.

11          Mr. Biale, you have raised an objection to the use

12   of the phrase "crew" in that sentence, though, you don't

13   dispute his participation in the robberies with the make-up

14   of individuals that pretty much overlap at least amongst the

15   various robberies.

16          Tell me the basis for the objection.

17          MR. BIALE:  Your Honor, I think --

18          THE COURT:  Because you know I know what a crew

19   is, I mean, let me just --

20          MR. BIALE:  Yes, I know.  And I think I have a

21   good sense for the Court's eye rolling every time I say it.

22          I mean, look, this is, I think, it's a

23   characterization of the Government.  We think that the

24   paragraph would more accurately read, it lists the people

25   and could just say "Committed robberies between June 2020

*Sentencing*                                                      10

1   and December 2021."  It's over my objection.

2            THE COURT:  I don't have a problem taking that

3   word out because it doesn't really matter.  Because, at the

4   end of the day, I know what a crew is.

5            MR. BIALE:  Fair enough.

6            THE COURT:  We'll amend the PSR.

7            The objection to Paragraph 4 has been withdrawn.

8            I was a bit perplexed about the objection to

9   Paragraph 5.  I didn't see the issue that you raised but am

10  I missing it?

11           MR. BIALE:  That was just to provide additional

12  context, your Honor.  I don't think -- I think I hear what

13  the probation department is saying that, as written, it's

14  accurate, I don't think we need to amend it.

15           THE COURT:  So are you withdrawing it or should I

16  overrule it?

17           MR. BIALE:  It's up to you.

18           THE COURT:  I'll overrule it.

19           MR. BIALE:  Okay.

20           THE COURT:  Now, you argue, as an objection to

21  Paragraph 6, that he did not negotiate the marijuana sale.

22  It was just negotiated by someone on his phone, but it seems

23  to me that a reasonable inference is that it was done on his

24  phone and, therefore, the negotiation that took place was

25  done by him.  I'm allowed to draw reasonable inferences.  I

*Sentencing*                                                        11

1   don't have a basis to draw any other one.

2          MR. BIALE:  I can explain a little bit of the

3   basis.

4          I don't think that this necessarily affects the

5   sentencing, I think it's a minor point.  But it's, you know,

6   we raised it just because that particular assertion is

7   factually inaccurate in our view.  The text messages that

8   were exchanged between the victim in this case, Mr. Baratta,

9   and the phone in question involved -- Mr. Baratta texted the

10  phone, Mr. Goulbourne responded whose question mark by which

11  he meant, Who is this?  Mr. Baratta responded, in sum and

12  substance, I thought this was the short man, which is a

13  reference to a different person.  And then said, this is

14  G, Victor's boy, we're looking to make a move and

15  Mr. Goulbourne never responded to those text messages.

16         So I agree various inferences can be drawn from

17  that.  This issue came up in our briefing on the motion to

18  suppress because the inference that the Government drew we

19  thought left out, or that the agents drew in that case, we

20  thought left out some of the important context of what

21  Mr. Goulbourne said and did not say in response to the text

22  messages.

23         So I lay that all out just to explain the basis

24  for the objection.  Again, I don't know that it is going to

25  affect your Honor's sentence, but I did want to make that

*Sentencing*                                                    12

1   all clear for the record.

2            THE COURT:  I'm going to overrule the objection.

3            Here, again, so with respect to Paragraph 13, what

4   you want is for the Court to note that he voluntarily

5   admitted to the agents that he deleted everything.  And the

6   Government's response to that is, while he provided the

7   information, he only did so upon the questioning by law

8   enforcement officers.  And so, what does voluntary mean in

9   that circumstance if it only happened in response to

10  questioning?  It is not as if he deleted the information.

11  They then walked in and he said, Oh, my God you know what I

12  just did and I should not have done, I deleted my phone.

13           MR. BIALE:  So that's correct, your Honor.  And I

14  can just read to you from the discussion just you have a

15  full record on it but I understand your Honor's point.

16           So the agents were asking him about the phone,

17  they asked him about the number.  He said I don't know the

18  numbers off my head.  Agent Duane asked him, and I'm quoting

19  from this transcript, Would you allow us to look at that

20  phone or this phone.  Would you allow us to look at this

21  phone?  Mr. Goulbourne said, Why?  Agent Duane said, To see

22  if we can find Mark's stuff on there.  Do you think there's

23  any text messages he may have left?  Mr. Goulbourne said, I

24  got so nervous I don't know what y'all did and I deleted

25  everything from the house.

*Sentencing*                                                    13

1          The agents asked when and what did he mean?

2   Mr. Goulbourne said, this morning, there is nothing in that

3   phone.  They said what do you mean, when did you delete it?

4   He said today.  There was some confusion.  Initially, they

5   asked, before we arrested you?  And he said yes.  Then he

6   clarified no, no, no this morning right here.  Check the

7   cameras, man.  Agent Livingston said, What, sitting in this

8   courtroom and Mr. Goulbourne said of course.

9          THE COURT:  Can I read it myself?

10          MR. BIALE:  Yes.

11          (A brief pause in the proceedings was held.)

12          THE COURT:  How long have they been at this

13   point -- how much time had transpired between the time that

14   he deleted the phone and this exchange?

15          MS. MCGRATH:  Approximately an hour, your Honor.

16          MR. BIALE:  I'm not sure.  I don't recall exactly.

17          There is a period where he's alone in the room

18   with the phone and I can't remember.  And I think he's left

19   alone at some point again in the middle and I can't remember

20   in which time he deletes the phone.

21          THE COURT:  Give me a moment.

22          Paragraph 13 indicates, and I don't think that

23   this part you objected to, is that when it was -- when he

24   was confronted, he claimed that he was deleting lewd photos.

25   And you made reference to that in your written submission.

1    By the way, okay, but, you know?

2              So that seems to be the bigger issue, and the fact

3    that that's what he offered up that I was deleting lewd

4    photos, in my mind, undermines the notion of any

5    voluntariness of the statement regarding the deletion.

6              MR. BIALE:  So, your Honor, I understand the

7    ruling.

8              THE COURT:  Yes.

9              MR. BIALE:  I was pointing to the fact that before

10   that he said, I deleted everything from the phone.

11             THE COURT:  No, I get it.  The passage of time

12   coupled with the representations by him that he was deleting

13   lewd photos, I'm just not going to give him the

14   voluntariness.

15             By the way, it also doesn't say that he lied that

16   he hadn't deleted either.  So it's kind of a neutral

17   paragraph when it comes to whether it was voluntary or not.

18   It just kind of identifies what occurred and I think that

19   that's sufficient for it to be accurate.

20             As you can imagine, the Court is not intending to

21   supplement the PSR with kind of Mr. Goulbourne's version of

22   the events that transpired between him and Mr. Louis;

23   however, the probation department has indicated that they

24   believe, and I believe, it's an appropriate amendment to

25   amend the paragraphs to indicate that they stem from

*Sentencing*                                                      15

1   domestic issues.  You did see that in the addendum, all

2   right?  So the PSR is amended to do so.

3           And I believe the clarification raised by the

4   defense with respect to Paragraph 39 to identify that it was

5   a Leatherman working tool, the probation department has

6   already amended the PSR to reflect that change.

7           Now, the firearms at Paragraph 40.  It seems to me

8   that when you go to Paragraph 40 of the PSR, at the top of

9   Page 11, it says, according to the N.Y.P.D. arrest report

10  and Court records on August 11th, it says, In front of 1331.

11  And your position is he didn't have it on his person but

12  they were in the house.

13          MR. BIALE:  Correct.

14          And, your Honor, I think, according to the

15  addendum, the additions that I suggested are noted which I

16  think is sufficient.

17          THE COURT:  Okay.  Good.

18          Now, Paragraphs 55, 57, and 61 were amended.  I'm

19  assuming, Mr. Biale, that those amendments satisfy you and

20  the Government has made no objections there.

21          MR. BIALE:  Yes, your Honor.

22          THE COURT:  Because they've incorporated your

23  objection.

24          MR. BIALE:  Yes.

25          THE COURT:  Okay, good.

*Sentencing*                                                    16

1        I think 85 is again it's just a recommendation by

2   the probation department, it's not a statement of fact it's

3   their opinion.  So I think the Government's position on that

4   is correct.

5        MR. BIALE:  I always object to it, your Honor.

6        THE COURT:  The Government has proposed amendments

7   to Paragraphs 11 to correct the identities of the respective

8   victims and also wanted to make a correction which is why I

9   think the documentation that you sent me today concerning

10  Mr. Goulbourne's medical condition as opposed to a burst

11  appendix was a dilated appendix.

12       MR. BIALE:  So, on that front, your Honor, and I

13  know this is going to be the subject of a --

14       THE COURT:  Evidentiary hearing.

15       MR. BIALE:  Yes.

16       So I spoke about this with Ms. McGrath.  The

17  record that we have that indicates to us that the appendix

18  ruptured came from the Brooklyn Hospital Center.  So it

19  appears that the rupture occurred in between the time that

20  he was at NYU Langone and the Brooklyn Hospital Center.

21       So what we proposed is because the way that the

22  paragraph in the PSR reads is -- this is 58.  It says,

23  "According to the docket entries," and goes on to describe

24  some of the filings.  And what I proposed to Ms. McGrath is

25  what we simply do just to clarify the paragraph is that

1    Line 3, the defendant was taken to NYU Langone's Brooklyn

2    emergency room, cut the rest of the sentence, and then say

3    he was then transferred to the Brooklyn Hospital Center

4    where he underwent a laparoscopic appendectomy.

5              Rather than having us try to interpret the medical

6    records, I think my reading of it is that he arrived at

7    Langone with a dilated appendix, it ruptured at some point.

8    When they performed the surgery at Brooklyn Hospital Center,

9    it had ruptured.  But I don't know that, again, it matters

10   so much for today's purposes and I think that that change to

11   Paragraph 58 would simply take out the ambiguity.

12             MS. MCGRATH:  And we concur with that proposed

13   amendment.

14             THE COURT:  So the clause where he was diagnosed

15   with the ruptured appendix will be deleted from the PSR.

16             I think with that all of the objections have been

17   resolved, am I correct?

18             MR. BIALE:  Yes, your Honor.

19             MS. MCGRATH:  Yes, your Honor.

20             THE COURT:  The Court adopts the PSR as modified

21   on the record.  And, of course, by the probation department

22   in its addenda.

23             I'll now calculate the sentencing guidelines

24   guideline range as to Mr. Goulbourne's offense.

25             The guideline for this offense is the Sentencing

*Sentencing*                                                        18

1   Guideline Section 2J1.2.  And pursuant to Sentencing

2   Guideline Section 2J1.2(c)(1).  Because the offense involved

3   obstructing the investigation or prosecution of a criminal

4   offense, Sentencing Guideline Section 2X3.1 is used to

5   determine the offense level.

6            Pursuant to Sentencing Guideline

7   Section 2X3.1(a)(3)(A), the base offense level here is 30.

8   Mr. Goulbourne has clearly demonstrated an acceptance of

9   responsibility for the offense.  Accordingly, the offense

10  level is decreased by two levels bringing the offense level

11  to 28.

12           I also understand that the Government intends to

13  make a motion indicating that it was notified in a timely

14  matter of Mr. Goulbourne's intention to enter a plea of

15  guilty.

16           Is that correct.

17           MS. MCGRATH:  Yes, your Honor.

18           THE COURT:  The Government's motion is granted.

19  The offense level is decreased by an additional point

20  pursuant to Sentencing Guideline Section 3E1.1(b) which

21  brings the offense level down to 27.  Of course, the Court

22  must take into account Mr. Goulbourne's criminal history in

23  calculating a guideline range.

24           Now, as to Mr. Goulbourne's criminal history, the

25  Court calculates a total criminal history score of three.

1          Now, according to the sentencing table at

2   Chapter 5 of the Sentencing Guidelines Part A, a criminal

3   history score of three establishes a Criminal History

4   Category of II.

5          Now, based on a total offense level of 27 and a

6   Criminal History Category of II, the guideline range for

7   imprisonment here is 78 to 97 months.

8          Now, because Count Fourteen is a Class C Felony,

9   the guideline range term for supervised release is one to

10  three years.

11         Now, because the applicable guideline range is in

12  Zone D of the sentencing table, Mr. Goulbourne is ineligible

13  for probation.  The fine range here is 30,000 to $250,000.

14         Are there any objections, folks, to the Court's

15  calculation of the guidelines range?

16         MS. MCGRATH:  No, your Honor.

17         MR. BIALE:  No, your Honor.

18         THE COURT:  At this time, I want to hear from the

19  parties regarding any departures.  You'll save your

20  arguments for a variance for later.

21         Any arguments on departures?

22         MS. MCGRATH:  The Government doesn't have any.

23         We believe that the PSR accurately states that

24  under 5K2.2 that there could be a departure and we have no

25  argument for one here.

*Sentencing*                                                  20

1          THE COURT:  What, I'm sorry.  You believe

2    that -- do you believe an upward departure is warranted --

3          MS. MCGRATH:  No.

4          THE COURT:  -- or no departure?

5          MS. MCGRATH:  No, your Honor.

6          THE COURT:  Then I think I misread your

7    submission.  I thought you were advancing an argument for an

8    upward departure.

9          MS. MCGRATH:  We're asking the Court to vary

10   upwards.

11         THE COURT:  To vary, not depart?

12         MS. MCGRATH:  We concur with your guidelines

13   calculation.  And we concur that Paragraph 85 of the PSR

14   accurately states that under 5K2 that there could be a

15   departure.  We're are arguing an above-guideline sentence

16   based on a variance.

17         THE COURT:  A variance, not the 5K2.  Okay.  All

18   right.

19         Any departure arguments?

20         MR. BIALE:  No.  My position on the 5K2 point is

21   set forth in my sentencing submission.

22         THE COURT:  Yes.

23         Having calculated the guidelines and the Court has

24   considered the arguments, or at least the assertion

25   advanced, rather, in the PSR concerning a departure, I must

*Sentencing*                                                              21

1   also consider the relevant factors set out by Congress in

2   18 U.S.C. Section 3553(a) to ensure that I impose a sentence

3   that is sufficient but not greater than necessary to comply

4   with the purposes of sentencing.

5           Now, these purposes include the need for the

6   sentence to reflect the seriousness of the crime, promote

7   respect for the law, and to provide just punishment for the

8   offense.  The sentence should also deter criminal conduct,

9   protect the public from future crime by the defendant, and

10  promote rehabilitation.

11          In addition to the guidelines and the policy

12  statements, I must consider the nature and the circumstances

13  of the offense, the history and the characteristics of the

14  defendant, the need to avoid unwarranted sentence

15  disparities among similarly situated defendants, the types

16  of sentences available, and the need to provide restitution

17  to victims of the offense.

18          Does the Government wish to make any arguments

19  about the application of the §3553(a) factors, request a

20  variance, or otherwise make a sentencing recommendation?

21          MS. MCGRATH:  Yes, your Honor.

22          THE COURT:  I'll hear from you now.

23          MS. MCGRATH:  So we won't belabor the points in

24  our own submission but do want to respond to some of the

25  arguments raised by defense counsel in his.

*Sentencing*                                                        22

 1         And one his central arguments seems to be that

 2    this defendant was primarily a getaway driver, he wasn't

 3    involved in violence and he wasn't directly involved with

 4    the victims and that's flatly belied by the evidence.  He

 5    was an integral member of this crew and he participated in

 6    three of the charged robberies.  These were not crimes of

 7    opportunity, they were thoughtfully planned.  The location

 8    is thoughtfully planned; the victims was chosen; the

 9    manpower was gathered; the cars they would us; and the guns

10    they would carry.  And the defendant was involved in all of

11    that.

12         For the Bronx robbery in July of 2020, the

13    defendant personally held the victim at gunpoint in broad

14    daylight.  For the Staten Island robbery in October 2021, he

15    secured and delivered the car they used to transport almost

16    one hundred pounds of marijuana.  And that victim was held

17    at gunpoint and threatened with death by a co-conspirator.

18    And for the Brooklyn robbery and homicide in 2021, the

19    defendant located and lured the victim Gregory Baratta.  He

20    supported a show-and-tell for marijuana in Queens.  And he

21    brought his brother, one of the shooters, to the robbery and

22    he provided a quick means of escape after the murder.

23         And what's notable here is not only did the

24    defendant transport his brother away, but then moments

25    later, he reversed back up the street at a high rate of

*Sentencing*                                                    23

1   street which let his brother run back into the house with a

2   gun in hand.  And what his brother would have seen was

3   Gregory Baratta lying on the floor, riddled with bullets,

4   unconscious.  There was a pure getaway driver, it wasn't the

5   defendant.

6         When he was finally caught he continued being an

7   integral member to the crew's success he deleted the

8   contents of his phone and instrumentality of these crimes

9   which contained evidence of these crimes.

10        And as your Honor will know, these are crimes with

11  real victims.  Individuals who were held at gunpoint,

12  threatened with death, and then who lost their father, their

13  son, their husband, Gregory Baratta.

14        So for those reasons, certainly, any suggestion

15  that a sentence of time served of 28 months would be

16  appropriate given the seriousness of the offense, the need

17  for just punishment and specific deterrence is entirely

18  inconsistent with the factual record.

19        Defense counsel notes that the guidelines range

20  here contemplates the conduct at issue, and so, a sentence

21  even within the guidelines may be appropriate.  Of course,

22  we're asking for a variance above the guidelines.  But we'll

23  just note that the guidelines don't contemplate all the

24  conduct here.  So the defendant is charged with obstruction

25  of justice involving murder.  The guidelines don't

*Sentencing*                                                     24

1  contemplate that he was involved in the underlying robbery

2  and drug trafficking conspiracy that led to that murder.

3  And they certainly don't contemplate that he was involved in

4  two other gunpoint robberies.  And this defendant himself is

5  charged with two §924(c)'s.  He's charged with banishing a

6  gun in the July 2020 robbery and he's charged with a

7  discharge of a gun in connection with the Brooklyn robbery

8  and homicide for aiding and abetting his brother who was

9  transported to and from the robbery with a gun in hand.

10          Defense counsel also notes that this defendant is

11  at the relatively low end of culpability and that's simply

12  not true.  The only defendants who more culpable than him

13  are the triggermen who killed Gregory Baratta.  He is only

14  one of two defendants charged in all three robberies.  And

15  he's only one of three defendants charged with two 924(c)'s

16  for his involvement in aiding and abetting of the gun

17  charges.

18          Importantly, this Court already sentenced one of

19  the defendant's co-conspirators, Amari Webber.  And there

20  are number of similarities amongst those defendants.  In

21  fact, many of the mitigating circumstances defense counsel

22  has raised is present in both those cases.

23          So Mr. Webber was gainfully employed; in fact, he

24  ws gainfully employed part-time even while in high school.

25  He was much younger than the defendant and he had a very

*Sentencing*                                                           25

1    limited criminal history.  He was also a father of two

2    children who he supported.  And he was at the MDC under

3    separation requests.

4              What separates the two of them is that this

5    defendant was involved in three of the armed robberies.

6    This defendant personally brandished a gun.  And this

7    defendant brought his brother back to the scene after the

8    shooting where he could again terrorize that family by

9    bringing a gun in.

10             The only additional mitigating circumstance

11   between the two is that this defendant suffered medical

12   complications while at the MDC which the Government agrees

13   is an appropriate consideration under the Section 3553(a)

14   factors and has also factored into its own sentencing

15   recommendation.

16             THE COURT:  I will say that it is interesting to

17   me just as the Court is in the role of having to decide an

18   appropriate sentence and weighing, as I do, the relevant or

19   respective culpability, rather, of each defendant.  The

20   Government made a determination to proceed with Mr. Webber

21   on charges that resulted, I believe, in a guidelines range

22   of 292 to 360-some-odd months.  And yet, this gentleman

23   here, whom you've described in a manner that you could say,

24   makes him at least sound as if the Government believes he's

25   more culpable but you pleaded him to a charge that carries

*Sentencing*                                                    26

1   with it a guidelines range that's considerably less and

2   would require the Court to vary upward.  It's just -- and I

3   can't intrude on, you know, decisions that are made with

4   respect to the plea, but I can't help but note it, right?

5   Because sometimes it does feel as if the Government is

6   asking of the Court to carry its water.

7            MS. MCGRATH:  So, certainly, your Honor, the

8   guidelines calculations for the two differ.  Both counts

9   carry a statutory maximum of 20 years.  A lot of factors

10  went into what would be an appropriate --

11           THE COURT:  I'm not asking to intrude, it was

12  really just commentary that I wanted to make.

13           MS. MCGRATH:  Understood.

14           THE COURT:  The last point of it being the most

15  important, that it seems as if in some respects that the

16  Government asked the Court to carry its water but go ahead.

17           MS. MCGRATH:  Understood, your Honor.

18           So, for all those reasons, given the seriousness

19  of the defendant's involvement in these crimes, the many

20  crimes he perpetrated, and the victims that were left in

21  their wake, the Government does believe that an

22  above-guideline sentence is appropriate here in the range of

23  108 to 135 months.

24           THE COURT:  All right.  Thank you.

25           Mr. Biale.

*Sentencing*                                                        27

1           MR. BIALE:  Thank you, your Honor.

2           So let me start out by contextualizing our ask a

3    little bit.

4           THE COURT:  Because it is an ask that is begging

5    for context.

6           MR. BIALE:  Well, that's why I wanted to start

7    there, your Honor.  And the reason it needs to be

8    contextualized is because stripped of some of the context

9    here, the request for a sentence of 28 months given, the

10   seriousness of the offense as Ms. McGrath described it does

11   seem incommensurate and we recognize that.  But there is

12   important context here and I want you to understand why we

13   made that request.

14          So we take the guidelines for this offense as they

15   are.  It's 78 to 97 months.  I have thought through sort of

16   what would be an appropriate variance downward from that

17   guidelines range.  And the fact that Mr. Goulbourne has been

18   incarcerated at the MDC under the conditions he's been in, I

19   think gives the basis -- so we provided to the Court,

20   there's a lot of judges in this district and the Southern

21   District, that have sorted treated as two-for-one credit the

22   time that people have spent in the MDC.

23          As I indicated in the submission, 28 months is

24   equivalent to a sentence of 33 months, approximately, when

25   you factor in good time.  So that's the sentence that

*Sentencing*                                                    28

1    Mr. Goulbourne has done already.  If we are giving him

2    double credit for the time that he spent in the MDC --

3              THE COURT:  He doesn't get double credit for the

4    good time.  No, if you're going to do the math you got to do

5    the math right.

6              So let's start with the 28.  You can't double

7    credit the 33, you see that?

8              MR. BIALE:  I don't think we end up in such a

9    different place and I did crunch these numbers earlier

10   because I thought you might say that.

11             THE COURT:  He didn't serve those extra few months

12   in the MDC, that's the good time credit, so it doesn't work.

13             MR. BIALE:  So let's take 28 times two and I'm

14   going to -- I may mess this up.

15             THE COURT:  56.  Did I get that right?

16             MR. BIALE:  56, let's take 56, okay?

17             So that is if we're treating each day that he

18   spent in the MDC as essentially two days equivalent to what

19   it would be in a humane system that we all think that we

20   ought to have, he's done 56 months.  If you add the good

21   time credit on to that, just to give the Court the number,

22   that gives us a little over 64 months as the sentence.

23   Okay?

24             So what I am asking for is a variance downward

25   from the bottom of the guidelines range, but not such a

*Sentencing*                                    29

1   dramatic downward variance as it would appear to go from 78

2   to 28.  I think the appropriate way to think about it really

3   is going from 78 to 64.

4          THE COURT:  That's if you assume that based on the

5   facts and circumstances of this case that the Court believes

6   that the bottom of the guidelines range is the appropriate

7   starting point.

8          MR. BIALE:  Understood, your Honor.

9          THE COURT:  And I don't.

10          MR. BIALE:  Okay, understood.

11          THE COURT:  Listen, I can't disagree with anything

12   that the Government set out with respect to how I should

13   view Mr. Goulbourne's role in this case.  I scribbled as the

14   Government was talking.  He was charged -- and I get, you

15   know, I made my comment about carrying the Government's

16   water because of the way in which this was pleaded

17   ultimately.  But nonetheless, he was charged in the three

18   charged robberies.  He did have a role in the planning.  He

19   did physically put a gun, I don't know if I would say to the

20   head because I can't remember that specifically, but he

21   certainly put a, you know, pointed a gun at the victim of

22   one of the robberies himself.

23          His role as, you know, a getaway driver, I do

24   think kind of understates what he did here.  Taking his

25   brother back where his brother then went back into the

*Sentencing*                                                    30

1    residence with a gun in hand.  I'm not certain what to

2    accomplish at that point given what had already transpired,

3    but nonetheless brought him back.  The deleting the contents

4    of his phone was just the culmination of all of the conduct

5    that he had engaged in.  It wasn't the definition of the

6    conduct that he had engaged in.

7               And this is a case where there's no question that

8    Mr. Goulbourne was aware that this sort of violence was

9    likely.  He, himself, carried a gun on one of the robberies.

10   He knew that all of his cohorts were carrying guns.  This is

11   exactly the type of violence that they contemplated and

12   prepared for.  I don't know how I could ignore all of those

13   facts.

14              I have great sympathy for Mr. Goulbourne and what

15   he has had to endure at the MDC and I promise, I need you to

16   step out of the way.

17              Mr. Goulbourne, I promise you, I'm going to take

18   that into account when I sentence you.

19              THE DEFENDANT:  Yes.

20              THE COURT:  But you're a grown man; you're a smart

21   man.  I've read a lot about you, right?  You are not -- I'm

22   telling you, I don't define you only by what transpired

23   here.  But this did transpire and you know as a parent that

24   actions have consequences, you know that.  I know that.  And

25   there has to be some sequences for this conduct because the

1    man that your family describes is certainly a man that could

2    understand that.  The man that your family knows, knows that

3    I can't abide by this.  They wouldn't abide by this.  And if

4    you were sitting in my shoes, the man who your family

5    describes, you, sir, too, would not abide by this we just

6    can't.  A man lost his life and you made choices and

7    participated in conduct that led to it.

8            Go ahead.

9            MR. BIALE:  And so, your Honor, we're not

10   disputing any of that.  I simply wanted to explain that the

11   request for the sentence that we're making should not be

12   construed as minimizing any of the conduct that took place.

13   But I think and I agree with the Government that here the

14   important sentencing factors include just punishment or

15   sometimes called retribution and deterrence, specific

16   deterrence.  And what we usually think of as accomplishing

17   those goals is some suffering that we impose on the

18   defendant to, in some way, it can never fully balance out,

19   obviously, the harm that is caused in a case like this.  But

20   we think that we can impose a certain amount of time that

21   will effect a certain amount of suffering on the part of the

22   defendant that they won't do it again and that it will be a

23   just punishment.

24           And I think that what Mr. Goulbourne has endured

25   here, we're not simply asking for a discount because of the

1   MDC conditions.  I think that what he has endured has

2   accomplished, to a substantial degree, you and I may

3   disagree on if it's gone all the way or if a little more

4   time is needed.  But I think to a substantial degree, the

5   suffering that he has endured at the MDC has accomplished

6   those goals of sentencing because of how bad it's been.  I

7   do want to say and, again, I'm not trying to minimize or

8   quibble with any of the discussion about Mr. Goulbourne's

9   participation, he's not disputing that.  You will hear from

10  him his feelings about his participation in that conduct.

11          I do object to the reference to other charges that

12  were brought against Mr. Goulbourne in this case.  Because

13  while the Government may have believed that there was

14  probable cause at the time of the superseding indictment to

15  bring those charges, the Government did ultimately make a

16  decision to offer Mr. Goulbourne a plea to one count of

17  obstruction of justice.

18          And I disagree with the Government that the

19  guidelines for that count do not incorporate the underlying

20  conduct because the way that the guidelines are structured

21  as your Honor described is through a cross reference to the

22  underlying conduct.  30 is the highest possible guidelines

23  range for an obstruction offense.  And when the defendant

24  accepted responsibility, Mr. Goulbourne is at the highest

25  possible total offense level that a defendant can be having

1    been convicted of that offense, okay?

2            So I understand that the guidelines here are

3    capped by the nature of the charge, but the Government made

4    the choice to offer Mr. Goulbourne a plea with that cap.

5            Now, part of the context of that, and I don't want

6    to get into a whole discussion of the plea negotiations, but

7    I will just note part of the context --

8            THE COURT:  Right because I can't intrude on plea

9    negotiations.

10           MR. BIALE:  And I'm not asking you to.  I just

11   want to remind the Court that some of what was happening at

12   the time leading up to Mr. Goulbourne's plea was the motion

13   that Mr. Goulbourne made regarding some of the warrants in

14   this case, the arrest warrant, and some of the

15   misrepresentations that were made to the magistrate judges

16   who approved those warrants by Task Force

17   Officer Livingston, okay, which involved misidentifying a

18   different member of the crew, or the group, whatever you

19   want to call it, as Mr. Goulbourne.

20           That motion -- and your Honor granted an

21   evidentiary hearing on it -- that motion, I believe, could

22   have seriously compromised the Government's case.  And

23   Mr. Goulbourne elected, rather than go forward with the

24   hearing, to accept the plea offer that the Government made

25   to him.  And that's significant I think for a variety of

1   reasons.  But one is because I think it represents an

2   important break between Mr. Goulbourne and the other

3   individuals in this case.  He could have pursued that motion

4   to see what sort of damage that it did to the Government's

5   case.  But, ultimately, he decided to plead guilty and to

6   allow the Government's case against other individuals to

7   proceed.

8          I want to turn a little bit to sort of what

9   Mr. Goulbourne's plan is going forward because, at some

10  point, obviously, he is going to get out of prison.  He has,

11  I would hope, a lot of time left ahead of him to make amends

12  and get things right.  And I think he has a plan for that.

13  He has a very supportive family as your Honor indicated.

14  Some of the bad influences that have been around him in the

15  past are no longer around him.  And I think it's fair to say

16  they will likely be -- they will likely not be on the

17  streets for a significant period of time.

18         Mr. Goulbourne is someone who has always dedicated

19  himself to work and gainful employment.  He has an offer

20  from the individual he worked with on the film shoots to

21  return to that work when he comes out of prison.  He will

22  continue to make music, which is really his passion, and,

23  you know, is really, in a lot of ways, the way in which he

24  sort of communicates his enthusiasm and love for the world.

25  And he and I have talked a lot about his music career and

1   about music in general.  And one of the things which he's

2   told me has been a very significant thing for him is that on

3   Sunday nights he's been able to hear in the MDC a reggae

4   program that plays some of his music.  And that has allowed

5   him, even in that place where it's understandable that

6   someone would feel only despair, that has allowed him to

7   recognize that he has a life outside of the MDC, outside of

8   this case; that he has productive pursuits and passion that

9   is he loves that he wants to return to.

10           And then finally, your Honor, I'll say that I

11  think Mr. Goulbourne is someone who, in the past, has done

12  well on supervision.  I think that, I mean, in some ways, if

13  it were possible for us to ask for a longer period of

14  supervision than three years, I might be asking for that in

15  this case because I know that the resources in the probation

16  department and this court will be immensely helpful to

17  Mr. Goulbourne as he transitions back to society.

18           Three years is the maximum supervised release

19  sentence, but I think that Mr. Goulbourne is prepared to

20  succeed on supervised release and to return to the

21  productive pursuits that he has focused on for much of his

22  life since his adolescence.

23           Unless the Court has any questions.

24           THE COURT:  I think the Government may want to

25  respond.

*Sentencing*                                                    36

1          MS. MCGRATH:  Your Honor, very briefly.

2          So defense counsel notes that the Court, of

3    course, is not asking the Court to consider the plea

4    negotiations but in effect he is.  He's suggesting that the

5    circumstances surrounding the timing for the plea are

6    indicative of some flaw in the government's case and we

7    fundamentally disagree with that.  Of course, your Honor has

8    no understanding of who approached who or why.

9          I'll just correct a few factual points.

10          So your Honor had ordered -- defense counsel had

11    requested a Franks hearing.  Your Honor had ordered a

12    pre-Franks hearing to determine if that standard had even

13    been met.  The defendant ultimately pled before the events

14    that later transpired.  But several other defendants,

15    raising similar alleged misstatements, proceeded further and

16    the Government asked the Court to assume that the statements

17    were made with the requisite intent which, of course, we

18    fundamentally disagree that they were.  And your Honor found

19    that they were immaterial.

20          And so, any suggestion that had the defendant not

21    pled and we had gone forward, we wouldn't be able to prove

22    the underlying charges is something we fundamentally

23    disagree with.

24          And just looking at the Government's description

25    of the events, which defendant does not dispute, it's easy

1    to see how they form the underlying charges in this case.

2           The defendant agreed that he held a gun to someone

3    while his co-defendant robbed him.  And it's easy to see how

4    that would amount to Hobbs Act Robbery, a drug trafficking

5    conspiracy, and a §924(c) involving brandishing.  And so, of

6    course, we did not ultimately convict the defendant of any

7    of those counts, but instead, we're going the Court to

8    consider the facts, undisputed, underlying those.

9           And so, also unless the Court has other questions

10   for the Government, those were the only points to which we

11   wanted to reply.

12          THE COURT:  Can I hear from Mr. Goulbourne?  You

13   can switch seats with him so he can stand up.

14          THE DEFENDANT:  Good afternoon, your Honor.

15          THE COURT:  Good afternoon, sir.

16          THE DEFENDANT:  I would like first to say I am

17   sorry to the family of Mr. Baratta.  I know what it's like

18   it lose a member of a family, it's like losing a part of

19   yourself.  Nothing I can say will bring him back or heal the

20   hurt that you are feeling.  I just want to say to you how

21   sorry I am.  Also, I want to apologize to the victims of the

22   other three robberies.  I am very sorry for the pain and

23   fear that I have caused by my actions.

24          I would like to apologize to my children and my

25   family because of my poor decisions that I've made.  I was

*Sentencing*                                                    38

1   not able to be there for you these past 28 months and I hope

2   to be reunited with you one day again.

3           Your Honor, I don't want to make any excuse for

4   my -- for what I did.  I take full responsibility for

5   deleting my text messages.  Knowing my actions were wrong

6   and I've been thinking about it night and day.  And it makes

7   me sad, it really makes me sad.  I thought about my choice

8   that night.  I felt a pain in my stomach from my panic.  I

9   thought I was going to die that night.  I though I would

10  never see my children again.  My bunky prayed for me with

11  Psalm 23 and Psalm 91 and saying you're not going to die.

12  And I kept telling him this feeling like death is upon me.

13  I am lucky that I didn't die that night, that I wanted to

14  dedicate the rest of my time that I have on this earth to

15  make better choices, make a positive impact on my children

16  and family and the community.

17          This is my plan moving forward whether bond or

18  free.  So I respect whatever decision you make.  But I do

19  ask that you consider my kids, especially my youngest one,

20  who needs their father.  When I came to MDC, one of my

21  twins, which was born on Valentine's Day, was only three

22  years at the time.  I was talking to her on the phone and

23  she couldn't speak that much yet but a spirit moved her and

24  she said, Daddy, where are you?  Ever since I heard that,

25  things have been different for me.  I hear that when I go to

*Sentencing*                                                        39

1    sleep.  I get nightmares.  Wake up in cold sweats.  This

2    bothers me, it's terrifying to me that they knows I am the

3    one that take care of them, grow them, do everything with

4    them.  Everything.  Their mothers is not that capable of

5    those certain things.

6              I'm asking you for mercy not for me but for my

7    kids so I can be there for them and grow them well and teach

8    them positive things.  And, your Honor, I would never return

9    to these dark moments again in life.

10             THE COURT:  Thank you, sir.

11             Does anyone have anything else before I take a

12   brief adjournment?

13             MS. MCGRATH:  No, your Honor.

14             COURTROOM DEPUTY:  All rise.

15             (Defendant exits from the courtroom.)

16             (A recess in the proceedings was taken.)

17             (Defendant enters the courtroom.)

18             COURTROOM DEPUTY:  All rise.

19             THE COURT:  You can be seated.

20             Before we proceed, Mr. Biale, I want to give you

21   an opportunity to address the departure issue which was not

22   the subject of discussion as the Government did not indicate

23   that it was seeking to pursue the departure based on

24   5X2.2(1) I believe it is.  And you indicated and -- or

25   5K2.2(1).  And you indicated that you objected to the

1   probation department's estimation that a departure, an

2   upward departure, might be warranted in this case pursuant

3   to 5K2.2(1) based on the argument that this charge already

4   considers in the guideline range the Hobbs Act robberies,

5   the §924(c) charges.  And I'm trying to figure out in my

6   mind if I agree with you on that and I have to tell you that

7   as I sit here now I don't because it appears to the Court

8   that the only charge that was taken into account in this

9   obstruction charge, in the determination of the guideline,

10  was the murder.

11         And indeed, when I even went back and looked to

12  the plea agreement that you all entered to, the only

13  reference that was referred to in the base offense level,

14  and there be other reasons for this, but was the cross

15  reference to the murder.  And I am struggling -- which would

16  get you at a base offense level of 30.  So I am struggling

17  to understand how the Court can conclude that the other

18  conduct that was originally charged, and for whatever

19  reason, how the Government ultimately arrived at its

20  charging decision and how you decided to proceed, 5K2.2(1)

21  does allow the Court to depart upward to reflect the actual

22  seriousness of the offense based on conduct, one, underlying

23  a charge dismissed as part of a plea agreement in a case or

24  underlying a potential charge not pursued in the case as

25  part of a plea agreement.

*Sentencing*                                                41

1          So any plea agreement was against the backdrop of

2     the existence of 5K2.2(1).  That was a big wind up but I am

3     interested to hear from you.

4          MR. BIALE:  Understood, your Honor.

5          So a couple of things.  One is that while it's

6     correct that the plea agreement contemplated as the

7     underlying charge the third robbery which included the

8     murder.  As part of the plea agreement, there was an

9     agreement that Mr. Goulbourne would not dispute his

10    participation in the other robbery.  So I don't think that

11    determines the 5K2.

12         THE COURT:  Which would allow the Court then to

13    feel more perhaps comfort.

14         MR. BIALE:  No, I want just for the Court to

15    understand that that was baked into the plea agreement, I

16    think, through that stipulation.

17         THE COURT:  Right.  But that doesn't make

18    it -- hold on.

19         Baked into your plea agreement, meaning, that the

20    Government said, look, you don't get to, you know, deny your

21    involvement in those robberies, is very different than baked

22    into the guideline range that is ultimately arrived at from

23    the plea agreement.  Those are very different concepts and I

24    am only addressing the latter.

25         MR. BIALE:  Understood.  So let me now address

*Sentencing*                                                         42

1    that.  So maybe that was my wind up.

2            I think to answer the Court's question about what

3    the guidelines would be if you calculated it for all of the

4    charges that are involved in the case, you would have to go

5    to --

6            THE COURT:  Well, that wasn't my question.

7    Because I understand there maybe a grouping analysis and

8    then there's a question about the points, et cetera.  I

9    understand that.  I'm talking specifically about the fact

10   that the sentencing guidelines allows the Court to take into

11   account the dismissed charges to reflect, quote, "the

12   seriousness of the crime."  I'm not talking about whether

13   the guidelines range has been properly calculated, we all

14   know it's been properly calculated.  But the guidelines

15   contemplate certain instances where the guidelines range

16   doesn't adequately reflect the seriousness of the charges

17   and allows for a departure upward.

18           And your argument, as I understood it before the

19   break, was that you did believe that it was -- as to point

20   two or subpart 2 of 5K2.2(1) that you had believed that

21   those other charges did factor into the determination, and I

22   was trying to understand your basis for saying that because

23   it didn't appear to be the case for me.

24           MR. BIALE:  Understood.

25           And just to clarify, yes.  So I think that I'm

*Sentencing*                                                    43

1    relying on that part 2 of 5K2.2 (1) which is that it's

2    charges that did not enter into the determination of the

3    applicable guidelines range.

4         What I'm saying is, here, even if you had that

5    grouping analysis, and I don't know if that would result in

6    a higher guidelines range, we are already at the maximum

7    guidelines range that is possible for the obstruction

8    counts.

9         THE COURT:  So for that reason and others, these

10   other charges, and there are numerous other charges, there

11   is Count One, the Hobbs Act Robbery conspiracy; Count Two,

12   the conspiracy to distribute and possess with the intent to

13   distribute; Count Three, the Hobbs Act Robbery; Count Four,

14   the possession with the intent to distribute; Count Five,

15   the possessing and brandishing of a firearm; Count Six,

16   Hobbs Act Robbery; Count Seven, possession with intent to

17   distribute; And Count Nine, Hobbs Act Robbery; Count Ten,

18   possession with the intent to distribute; Count Eleven

19   possessing, brandishing, and discharging a firearm.

20        MR. BIALE:  So, your Honor, many of those counts,

21   including Counts One and Two and Count Eleven that you just

22   referenced are different ways of charging the same

23   conduct --

24        THE COURT:  I understand.

25        MR. BIALE:  -- in the December 3rd robbery.  So I

*Sentencing*                                                        44

1    think we're only talking about --

2            THE COURT:  Fair enough.

3            MR. BIALE:  So what I am saying, and I understand

4    the Court's position, what I am saying is that I don't think

5    that if you -- if a grouping -- even just assuming a

6    grouping analysis on those other robberies were to increase

7    the guidelines level, I think that they're already taken

8    into account by the most serious conduct being factored into

9    the obstruction count.  And using that conduct to bring you

10   up to the highest guidelines range possible under 2J1.2.  So

11   it wouldn't make a difference is what I'm saying from a

12   guidelines perspective.

13           THE COURT:  But this provision is about not kind

14   of the technical calculation of the guideline, but the

15   question of whether the guideline that is technically

16   calculated, right, reflects the seriousness of the offense.

17   This is a different inquiry.  It might be next to the

18   guidelines calculation, but it's a different inquiry and it

19   asks the Court to answer a different question.

20           MR. BIALE:  I understand, your Honor's point.  I

21   think I'm going to rest on my argument as it stands.  I

22   think that whether it's, as a departure, a variance which is

23   what the Government is urging.  We are talking about sort of

24   the same question, the same §3553(a) factors which is how do

25   you balance the seriousness of the offense which we concede

*Sentencing*                                                45

1   with Mr. Goulbourne's history and characteristics and what

2   he's had to deal with at the MDC.  So I don't know that -- I

3   understand the Court's point.  I don't think that it makes

4   so much a difference whether you treated it as a departure

5   or a variance.

6                THE COURT:  It doesn't.  But it's the same

7   question, it's the same issue, as to whether in this case a

8   guidelines range of 78 to 87 months reflects the seriousness

9   of the crimes to which Mr. Goulbourne engaged in.  I mean,

10  that's ultimately the question.  And, you know, the

11  Government's argument is they don't care whether I call it a

12  variance or a departure, the answer to that question from

13  the Government's perspective is, no, it doesn't.  And, you

14  know, even in the way that Mr. Goulbourne talked about what

15  he did and his regrets.  The regret was -- first, let me

16  take a step back.

17               First, he apologized to the victim of the crime so

18  I don't want to take that from you.  So forgive me because I

19  need to make sure that I adequately capture what it is that

20  you said to this court.  So I don't want to minimize what

21  you said.

22               But there seems to be this focus on this

23  obstruction.  But the obstruction is, you know, as I had

24  said earlier, was the culmination of a lot of conduct as

25  opposed to the conduct, really, that is the most concerning

1    to the Court.

2         I recently sentenced someone as an accessory

3    after-the-fact to a murder.  I sentenced them to 60 months.

4    And I sentenced them to 60 months in part because their role

5    was only after the fact.  They took no part whatsoever in

6    anything that led up to the murder including its planning or

7    its participation in the pattern of conduct which we have

8    here, a pattern of conduct, that led to what I believe was

9    an inevitability:  Someone was going to be killed.  And it

10   could have been Mr. Goulbourne, it could have been his

11   brother, it could have been one of the victims.  But this

12   conduct was going to lead to someone's death.

13        In the case that I recently sentenced, that

14   individual didn't participate in that.  It was only after

15   the fact that Mr. Goulbourne sits differently than that

16   individual who was charged with a similar crime or the same

17   crime.

18        MR. BIALE:  And I don't know the circumstances of

19   that murder so I can't speak to that.  I mean, this is, you

20   know, I know that your Honor dealt with questions of felony

21   murder, intentional murder, when you sentenced Mr. Webber

22   and that's come up with the other defendants in the case and

23   that's not really our hill to die on.

24        THE COURT:  No, I know.

25        MR. BIALE:  But I do want to say that I think with

1    respect to the Mr. Goulbourne's acceptance of

2    responsibility, and I understand there was an aspect of what

3    he said which may be.  And, you know, I worked with him on

4    the statement, they're his feelings and his words, but we

5    worked on it together.

6              THE COURT:  I think I diminished what he said so

7    don't take what I said --

8              MR. BIALE:  I just want to be clear that one of

9    the things that Mr. Goulbourne absolutely wanted to express,

10   and I think did express, is his feelings about his

11   participation in all of the underlying conduct.

12             THE COURT:  He did because he apologized for that.

13   And I think that when I -- that was an error on my part, so

14   I want to be clear.  I heard what you said and I think my

15   last statement really undermined the kind of the thrust of

16   the statement that you made to me so I apologize for that.

17             MR. BIALE:  Okay.  So I think we all understand

18   each other on that front.  So, I think, I'm not sure I have

19   more to say, your Honor.

20             THE COURT:  Yes.

21             MR. BIALE:  You have the argument.  Sorry, one

22   moment.

23             (A brief pause in the proceedings was held.)

24             MR. BIALE:  Your Honor, just for the record, I was

25   just clarifying to Mr. Goulbourne that your Honor's comments

*Sentencing*                                                    48

1   do not suggest that you believe he went into the house or

2   discharged the firearm but, rather, it's about the course of

3   conduct and what was foreseeable to him.

4              THE COURT:  Yes.  If that's how you explained it

5   to Mr. Goulbourne, your explanation is absolutely correct.

6   I know that you didn't go into that house.  But I do hold

7   you responsible, Mr. Goulbourne, for participating in a

8   pattern of conduct with other individuals and one that also

9   started with, in the first instance, where you held a gun to

10  an individual's head and participated in the robbery, or not

11  to their head, but at them, forgive me.  You held a gun at

12  them.

13             There were just so many opportunities where you

14  had the ability to say, I'm not going to do this again.

15  This is not one occasion, this the not two occasions, this

16  is three occasions that I'm aware of where you or

17  individuals with whom you associated with brought guns into

18  a situation to be able to rob from individuals.  And, again,

19  I believe that the outcome here was inevitably that someone

20  would be hurt or killed.

21             Did the Government want to respond to any of this?

22             MS. MCGRATH:  Unless your Honor has questions for

23  us, no.

24             THE COURT:  All right.  This is probably one of

25  the -- I feel like I say this every time I get on the bench

1    to do a sentencing but it is a difficult sentencing.  And

2    I've never, ever been faced, by the way, with a gulf as

3    large as this in terms of where the Government is asking the

4    Court to fall and where the defense is asking the Court to

5    fall.

6              I believe that the Court must take into

7    consideration the conditions of confinement that

8    Mr. Goulbourne was subjected to at MDC.  However, I disagree

9    with you, Mr. Biale, that a time-served sentence even

10   approaches something that balances the Court's need to

11   afford Mr. Goulbourne some consideration for that which he

12   is due.

13             Also, with my apology, right, I'm not part of the

14   Executive Branch; I don't run the MDC, but I want to

15   apologize to you because you should not have had to endure

16   that.  It was wrong and I can account for it, but I cannot

17   account far it in the way that Mr. Biale has asked me to.  I

18   have to balance these things out, and I when I balance it

19   out, I can't get there.  And I'm going to be honest with

20   you, I can't get close to there.

21             I have kind of spoken about my views on the

22   conduct here a number of times, and so, I don't think I need

23   to belabor that.  The question is:  Where do I arrive at

24   with the proper balancing of the circumstances and,

25   ultimately, taking into consideration all of the competing

1   considerations that I must under §3553(a) which, in a case

2   like this, where someone lost their life, chief among them

3   is the seriousness of the crime as well as the need to

4   afford adequate deterrence to criminal conduct.

5            Give me a second.

6            In my estimation, a variance below the guidelines

7   in this case is not warranted, and indeed, I believe that

8   the appropriate starting point for this court would be at a

9   guideline range that reflects a departure upward based on

10  all of the facts and circumstances in this case and the

11  uncharged conduct.

12           That said, the Court must take into consideration

13  the conditions of confinement, and ultimately, I fall at a

14  guideline range, at the original guideline sentence of

15  80 months in custody.

16           Mr. Goulbourne, I know that's not the sentence

17  that you had hoped for but what you said to me in your

18  statement was that you had plans for yourself no matter how

19  the Court sentenced you and I respect that mightily.  And I

20  hope that you meant that for your sake, not for mine,

21  because I do believe that you have much to offer to your

22  friends, your family, and your community.  We just have to

23  get this done first, okay?

24           I believe that the Court's sentence is sufficient

25  but not greater than necessary to comply with the purposes

*Sentencing*                                                          51

1  of sentencing.  I must also consider whether to impose

2  supervised release.

3         I will quickly identify the factors that the Court

4  considers which is the nature and the circumstances of the

5  offense, the history and characteristics of the defendant,

6  the need to afford adequate deterrence to criminal conduct,

7  the need to protect the public from further crimes, the need

8  to provide the defendant with needed educational or

9  vocational training, medical care, and correctional

10 treatment.  The need to avoid unwarranted sentence

11 disparities among defendants with similar records found

12 guilty of similar conduct.  The need to provide restitution

13 to any victims.  The kinds of sentences and sentencing range

14 established for the offense and pertinent policy statements.

15        Now, Mr. Biale, in your submission, you had

16 encouraged the Court and here today a high end of the

17 guidelines range for supervised release.  I know that

18 recommendation was made against the backdrop of your other

19 recommendation which was a significantly lower custodial

20 period.  So I want to hear from you as to what you believe

21 is appropriate here.  I will say that I am a firm believer

22 in how supervised release can help the defendants that

23 appear before me because of the resources that we have

24 available to them, not as a means of punishment but as a

25 means of assistance, but I am happy to hear from you.

*Sentencing*                                               52

1          MR. BIALE:  So, your Honor, I think generally, I'm

2     going to defer to the Court on this.  I do think that given

3     the additional time that Mr. Goulbourne is going to spend

4     incarcerated that some reduction in the supervised release

5     period would be appropriate in fashioning a sentence overall

6     that comports with the §3553(a) factors, so I would ask that

7     you impose a sentence of two years of supervised release on

8     top of the incarceration.

9          THE COURT.  Anything from the Government.

10          MS. MCGRATH:  We take no position on that, your

11     Honor.

12          THE COURT:  I tend to agree that a two-year period

13     of supervised release is appropriate and I am also going to

14     suggest and recommend that when Mr. Goulbourne is released

15     that to the extent the Ray's Court is still operating, if he

16     is eligible that an invitation be extended to join our

17     Ray's Court.  Our Ray's Court is for gentlemen who have been

18     released from custody.  And during their first year of

19     supervised release, they come and they meet with me and

20     other individuals in this court.

21          And it's a reentry court and it is designed to

22     assist you in transitioning back into society in a

23     meaningful way, right?  We have resources, including legal

24     counsel that are available to you.  I am there to encourage

25     you and hold you accountable, both of those things.  And

*Sentencing*                                                    53

1   when you successfully complete our Ray's Court and graduated

2   out of our Ray's Court it does give you an opportunity to

3   reduce the amount of time that you have on supervised

4   release.  And I believe that you would be a good candidate

5   for this program.  And I believe that you would be

6   successful and you would give me an opportunity to award you

7   with a -- for that success with reducing your period of

8   supervised release.

9        So it is a voluntary program, you have to be

10  eligible for it, but I do hope that if given the

11  opportunity, that you take advantage of that opportunity and

12  you join me in Ray's Court.  We got to do this first.

13       THE DEFENDANT:  Right.

14       THE COURT:  Which you can do, right?  And then

15  we're going to go on.  And all of those things that you have

16  planned for yourself, you're going to be able to accomplish.

17  I have no doubt.

18       I need to now take about the terms and conditions

19  of your release.

20       If you violate any of the conditions of your

21  supervised release, I may sentence you to up to two years in

22  prison without credit for your pre-release imprisonment or

23  time previously served on post-release supervision.

24       Now, during your period of supervised release, you

25  must abide by the following mandatory conditions of

*Sentencing*                                                          54

1   supervised release.

2              You must not commit another federal state or local

3   crime.  You must not unlawfully possess a controlled

4   substance.  And you must refrain from any unlawful use of a

5   controlled substance.

6              But the probation department doesn't believe that

7   the testing provision is necessary, correct?

8              MS. MALKO:  Correct, your Honor.

9              THE COURT:  You must cooperate -- so he's accused

10  excused from that.

11             You must also cooperate in the collection of DNA

12  as directed by the probation officer.

13             In addition, you must abide by the following

14  standard conditions of release.

15             Sir, you shall report to the probation office in

16  the federal judicial district where you were authorized to

17  reside within 72 hours of release from imprisonment unless

18  the probation officer instructs you to report to a different

19  probation office or within a different timeframe.

20             After initially reporting to the probation office,

21  you will receive instructions from the Court or the

22  probation officer about how and when to report to the

23  probation officer and you shall report as instructed.

24             You shall not knowingly leave the federal judicial

25  district where you were authorized to reside without first

*Sentencing*                                                    55

1    getting permission from the Court or the probation officer.

2           You shall answer truthfully the questions asked of

3    you by the probation officer.

4           You shall live in a place approved by the

5    probation officer.  And if your plans change with respect to

6    where you live or anything about your living arrangements,

7    including the people you live with, you shall notify the

8    probation officer at least ten days before the change.  If

9    notifying the probation officer at least ten days in advance

10   is not possible, due to unanticipated circumstances, you

11   shall notify the probation officer within 72 hours of

12   becoming aware of the change or expected change.

13          You shall allow the probation officer to visit you

14   at any time at your home or elsewhere and you shall permit

15   the probation officer to take any items prohibited by the

16   conditions of your supervision that the probation officer

17   observes in plain view.

18          You shall work full-time, that is, at least 30

19   hours per week at lawful type of employment unless the

20   probation officer excuses you from doing so.  If you do not

21   have full-time employment you shall try and find full-time

22   employment unless the probation officer excuses you from

23   doing so.

24          If your plans change with respect to where you

25   work or anything about your work including your job position

*Sentencing*                                                          56

1   or responsibilities, you shall notify the probation officer

2   at least ten days before the change.  If notifying the

3   probation officer in advance is not possible due to

4   unanticipated circumstances, you shall notify the probation

5   officer within 72 hours of becoming aware of the change or

6   expected change.

7            You shall not communicate or interact with someone

8   you know who is engaged in criminal activity.  If you know

9   someone who has been convicted of a felony, you shall not

10  knowingly communicate or interact with that person without

11  first getting permission of your probation officer.  If you

12  are arrested or questioned by a law enforcement officer, you

13  shall not notify the probation officer within 72 hours.

14           You shall not own, possess, or have access to a

15  firearm, ammunition, destructive device or dangerous weapon.

16  That's anything that was designed or modified for the

17  specific purpose of causing bodily injury or death to

18  another person like a Taser.

19           You shall not act or make any agreement with a law

20  enforcement agency to act as a confidential human source or

21  informant without first getting permission of the Court.

22  And if the probation officer determines based on your

23  criminal record, personal history and characteristics as

24  well as the nature and circumstances of your offense, that

25  you pose a risk to another person, the probation officer,

*Sentencing*                                                    57

1   with prior approval of the Court, may require you to notify

2   the person about the risk and you must comply with that

3   instruction.  The probation officer may contact the person

4   and confirm that you have notified the person about the

5   risk.

6          You shall follow the instructions of the probation

7   officer related to the conditions of your supervision.

8          The Court circulated to the parties the special

9   conditions of supervised release.  Did you have an

10  opportunity to review that?

11         Has it been executed?

12         MS. MCGRATH:  Apologies, your Honor, no.  If there

13  is no objection from the defendant we can do that.

14         MR. BIALE:  No objection.

15         THE COURT:  All right.

16         (A brief pause in the proceedings was held.)

17         THE COURT:  The document entitled "Special

18  Conditions of Supervised Release or Probation" has been

19  marked as Court Exhibit 1 and it's been executed by

20  Mr. Goulbourne, Mr. Biale, and the Government.

21         Now, my question is whether the parties waive the

22  reading of this special conditions for the record.

23         MS. MCGRATH:  The Government does.

24         MR. BIALE:  Yes, Your Honor.

25         THE COURT:  All right.  Mr. Biale, are the reasons

*Sentencing*                                                    58

1    for the Court's imposition of this condition apparent to you

2    on the face of the condition?

3              MR. BIALE:  Yes, Your Honor.

4              THE COURT:  The Court so orders the special

5    condition as set forth in Court Exhibit No. 1.

6              I must order that Mr. Goulbourne to pay a special

7    assessment in the amount of $100.  However, I decline to

8    impose a fine as it does not appear as if Mr. Goulbourne has

9    the ability to pay one.

10             Mr. Goulbourne, I want to apprise you that you

11   have a statutory right to appeal your sentence under certain

12   circumstances, particularly, if you believe that your

13   sentence is contrary to law.  However, I will note for you

14   that as part of your agreement with the Government, you

15   agreed not to appeal your sentence if the sentence was set

16   at 135 months or below in custody which, of course, the

17   Court did today.

18             Any notice of appeal must be filed within 14 days

19   of the entry of judgment or within 14 days of the filing of

20   a notice of appeal by the Government.  If requested, the

21   clerk will prepare and file a notice of appeal on your

22   behalf.  And if you cannot afford to pay the cost of an

23   appeal, or for appellate counsel, you have the right to

24   apply for leave to appeal in forma pauperis which means you

25   can apply to have the Court waive the filing fee.  And on

*Sentencing*                                                      59

1    appeal, sir, you may also for court-appointed counsel.

2            Would you like the Court to make a recommendation

3    with respect to a facility?

4            MR. BIALE:  Yes, Your Honor.  Recommendation for a

5    facility close to New York City.

6            THE COURT:  I'll recommend that he be housed in a

7    facility as close to the New York City-Metropolitan area as

8    possible.

9            Does the Government wish to make a motion at this

10   time?

11           MS. MCGRATH:  Your Honor, we just note that the

12   plea agreement does contemplate forfeiture but we understand

13   it will be done administratively so we don't require an

14   order.

15           And we'd also like to move to dismiss open counts

16   in the superseding indictment, those are Counts One through

17   Seven and Nine through Eleven as to the defendant and then

18   all underlying counts in the indictment.

19           THE COURT:  Okay.  In superseding indictment,

20   Counts One through Seven and Nine through Eleven as to

21   Jonathan Goulbourne are dismissed as well as all the counts

22   in the underlying indictment.

23           MS. MCGRATH:  Thank you, your Honor.

24           THE COURT:  Again, I do wish you luck,

25   Mr. Goulbourne.

1              And to your son, I know that your father

2     appreciated you being here today and he'll appreciate your

3     support throughout his custodial period.  And the work will

4     begin as well, though, when he's released you understand and

5     you will be there to help him and support him, yes.

6              JAMARI GOULBOURNE:  Yes.

7              MR. BIALE:  I have one request, your Honor.  I

8     spoke with the marshals about whether Mr. Goulbourne and his

9     son could spend a little time talking.  They said if you

10    direct that that happened they can make it happen.

11             THE COURT:  Absolutely.

12             MR. BIALE:  I request that you do that.

13             THE COURT:  Yes.

14             How do you all want to do that?  Just here in this

15    courtroom for a few minutes.

16             THE MARSHAL:  Could you give me a second, your

17    Honor.

18             THE COURT:  Sure.

19             (A brief pause in the proceedings was held.)

20             THE MARSHAL:  Yes, Your Honor.

21             THE COURT:  So how do you want it to happen.

22             THE MARSHAL:  We can have him seated at the far

23    end and have the family member come to the first row.

24             THE COURT:  Okay.  What's your name?

25             JAMARI GOULBOURNE:  Jamari.

1          THE COURT:  Jamari, come and sit in this first row

2    here.  Thank you.  And then you don't need us to allow them

3    to speak.  So I'm going to excuse myself so that they can

4    excuse themselves so they can have an opportunity to speak

5    without us listening.

6          All right.  Good luck to you, sir.

7          COURTROOM DEPUTY:  All rise.

8          (Defendant exits from courtroom at 2:17 p.m.)

9          (WHEREUPON, this matter was concluded.)

10

11                         *   *   *

12

13                  <u>CERTIFICATE OF REPORTER</u>

14

15    I certify that the foregoing is a correct transcript of the
      record of proceedings in the above-entitled matter.

16

17

18

19    *Anthony D. Frisolone*

20    _____

21    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
      Official Court Reporter

22

23

24

25