**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

   - against -

MARCUS RICKETTS,
     also known as "Darnell Dogan,"
     "Conroy Cornelius" and "Blaise,"
MARK GOULBOURNE,
     also known as "Short Man,"
JUVAINE CROSSGILL,
     also known as "Geo,"
JONATHAN GOULBOURNE
     also known as "Bobcat,"
ROMEO JONAS,
     also known as "Tee,"
AMARI WEBBER,
     also known as "Smooth"

            Defendants.

No. 22-CR-106 (LDH)

**JONATHAN GOULBOURNE'S PROPOSED FINDINGS OF FACT FOLLOWING**
**EVIDENTIARY HEARING ON JANUARY 13, 2025**

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: nbiale@shertremonte.com

*Attorneys for Jonathan Goulbourne*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

PROPOSED FINDINGS OF FACT ........................................................................ 2

    A.    Mr. Goulbourne Develops Appendicitis and Is Taken to the Hospital .................. 2

    B.    MDC Medical Staff Prescribe Mr. Goulbourne Painkillers and Antibiotics .......... 3

    C.    Mr. Goulbourne Is Transferred to the SHU and, Through Counsel, Raises Urgent Concerns About the Provision of His Medication ...................................... 5

    D.    Responses of MDC Legal and Medical Staff to Concerns Raised by Counsel ................................................................................................................ 8

        a.    Bruce Bialor ............................................................................................. 8

        b.    Marilyn Garcia .........................................................................................11

        c.    Blake Glucksnis .......................................................................................11

        d.    Elizabeth Lynch ...................................................................................... 15

    E.    The Court's Inquiries and May 1, 2024 Hearing ................................................ 22

CONCLUSION .................................................................................................... 24

## PRELIMINARY STATEMENT

1.      Jonathan Goulbourne, by and through his undersigned attorneys, respectfully submits these proposed findings of fact regarding the evidentiary hearing held on January 13, 2025 (the "Hearing").

2.      The evidence presented at the Hearing revealed a shocking lack of policy and training, coupled with a casual disregard for the health and safety of individuals in the care of staff at the Metropolitan Detention Center ("MDC").

3.      The purpose of the Hearing was to determine "which members of the medical staff lied when [Supervisory Attorney Sophia Papapetru] inquired about the provision of the final doses of Mr. Goulbourne's antibiotics." May 1, 2024 Hr'g Tr. 25:9-11. Ms. Papapetru represented to the Court that it was Health Services Administrator Blake Glucksnis who lied to Staff Attorney Elizabeth Lynch. *See id.* at 25:13-25, 26-27.

4.      But when Ms. Lynch testified at the Hearing, it turned out that this, itself, was untrue. She stated that she obtained the information from the MDC's pharmacy department, which she relayed to defense counsel *before* receiving any information from Mr. Glucksnis. Hr'g Tr. 213:12-17.

5.      Despite defense counsel's clear and repeated emails concerning the provision of the remainder of Mr. Goulbourne's antibiotics after he was placed in the SHU, MDC staff, including Ms. Lynch (an attorney and former assistant district attorney), testified that they misunderstood the emails to be asking whether the medical department had provided Mr. Goulbourne with his prescribed medication at all. These explanations were not credible.

6.      Not one witness from the MDC took responsibility for their failure to provide proper care to Mr. Goulbourne; instead, all of the witnesses effectively blamed Mr. Goulbourne

1

for failing sufficiently to advocate for himself.  Not one witness testified in any respect how they

planned to improve policies and practices at the facility to ensure better treatment in the future.

7.        Accordingly, this Court should find the facts set forth herein and impose

appropriate sanctions.

## PROPOSED FINDINGS OF FACT

**A.  Mr. Goulbourne Develops Appendicitis and Is Taken to the Hospital**

8.        Sometime in the evening of April 14, 2024, Mr. Goulbourne began experiencing

abdominal pain, nausea, and vomiting.  MDCX-B, MDCX-C.

9.        In order for Mr. Goulbourne to be seen by someone from the MDC medical staff

that night, a corrections officer would have had to notify the medical department, as the MDC

"do[es]n't have enough staff to have a specific, let's say, RN on each housing unit."  Hr'g Tr.

54:22-23.  Although Mr. Goulbourne requested medical assistance from the corrections officer

on his unit, there is no "clinical encounter document," *id.* at 16:4, from April 14 in the record,

indicating that Mr. Goulbourne was not seen by any medical staff at that time.

10.        The following morning, at 7:52 AM, Mr. Goulbourne was seen by a registered

nurse and "complain[ed] of vomiting during the evening and swelling to his lymph nodes."

MDCX-A.  The nurse who saw Mr. Goulbourne that morning indicated that he was in "no

apparent distress" and "Appears Well, Alert and Oriented."  *Id.*; *see also* Hr'g Tr. 55:12-14

("That means he's – he appeared well.  He didn't appear acutely ill.  And that he was alert and

oriented to person, place and time.").

11.        Less than six hours later, at 1:41 PM, Mr. Goulbourne was seen again, this time

by a different registered nurse and by Dr. Bruce Bialor, the medical director.  MDCX-B; Hr'g Tr.

57:9-12.  Mr. Goulbourne reported that his pain was "10/10," MDCX-B, which "means he's in

severe pain, the worst." Hr'g Tr. 57:23.  Nonetheless, the nurse practitioner described Mr.

Goulbourne's appearance "the same way as the nurse from earlier in the morning"—the clinical

encounter report stated that he "appeared well, alert and oriented." *Id.* at 57:17-19.

12.    Based on Mr. Goulbourne's "severe abdominal pain and . . . tenderness in the

right lower quadrant," Dr. Bialor made the decision to send him to the emergency room at NYU

Langone.  Hr'g Tr. 18:23-19:5.

13.    For reasons unexplained in the record, Mr. Goulbourne was not actually examined

at the emergency room until approximately 10:30 PM that night, *i.e.*, almost nine hours after Dr.

Bialor "instructed my nurse practitioner to write the consult for him to go to the emergency

room." Hr'g Tr. 19:4-5, 18-22.

14.    Mr. Goulbourne was subsequently transferred to the Brooklyn Hospital Center,

where he underwent an appendectomy.  MDCX-D-1.[1]

**B. MDC Medical Staff Prescribe Mr. Goulbourne Painkillers and Antibiotics**

15.    After recovering in the hospital, Mr. Goulbourne was transferred back to the

MDC on April 18, 2024.  MDCX-F.

16.    Dr. Bialor and Nurse Marilyn Garcia examined Mr. Goulbourne when he returned.

*Id.*  He was still experiencing pain, and Dr. Bialor and Ms. Garcia noticed an area of redness

around one of his incisions.  Hr'g Tr. 25:22-24.  According to Dr. Bialor, the redness indicated "a

mild postop wound infection." *Id.* at 26:7.

---

[1]    The hospital records are unclear as to whether Mr. Goulbourne was ultimately diagnosed
with "complicated appendicitis," which, according to Dr. Bialor, could be indicative of a
"perforation" or "uncomplicated appendicitis." Hr'g Tr. 86:4-9; 91:16-17; *see also* Def.'s Ex. 2.
Whether Mr. Goulbourne's appendix in fact perforated before the appendectomy is irrelevant,
however, as MDC staff did not know the ultimate post-operative diagnosis during the relevant
time period.

17.     Dr. Bialor prescribed Keflex, an oral antibiotic, to be taken in increments of 500 milligrams twice a day for five days. *Id.* at 26:3-9. He also prescribed a stool softener and three days of Percocet. *Id.* at 26:12-21.

18.     At the clinical encounter on April 18, Ms. Garcia gave Mr. Goulbourne one dose of antibiotic and one dose of Percocet. *Id.* at 29:3-11.

19.     The following day, April 19, the MDC pharmacy dispensed a five-day supply of antibiotics to Mr. Goulbourne. MDCX-G. The pharmacy records state that the medication is to be taken "one capsule (500 MG) by mouth twice daily for 5 days," and that the expiration of the medication was "04/24/24." *Id.*; *see also* Hr'g Tr. 31:1-4 ("THE COURT: So it would have been five days' worth dispensed on April 19th exclusive of what was dispensed on the 18th? THE WITNESS: Yes, Your Honor.").

20.     The antibiotics were given as "self-carry," meaning that Mr. Goulbourne was dispensed the entire ten-pill bottle to keep with him in his housing unit. Hr'g Tr. 28:10-17.

21.     Neither Dr. Bialor nor Ms. Garcia ever told Mr. Goulbourne not to take the full course of antibiotics, or that he needed to take the antibiotics only "till the redness resolves." *Id.* at 64:1-3. To the contrary, Dr. Bialor testified, "Of course, we would not tell him that," *id.*, and Ms. Garcia testified that she told Mr. Goulbourne that "it is very important for him to take the full course [of antibiotics]." *Id.* at 123:4-7.

22.     Mr. Goulbourne was not provided with his dose of Percocet from the pill line on April 21, 2024 because, according to the medical records, he refused to provide identification. Hr'g Tr. 36:24-37:2.[2]

---

[2]     Although the pharmacy records indicated that Mr. Goulbourne's Percocet prescription expired on April 20, 2024, MDCX-G, Dr. Bialor testified that that pharmacy record was not correct, and Mr. Goulbourne should have received Percocet on April 21. Hr'g Tr. 37:14-17.

### C. Mr. Goulbourne Is Transferred to the SHU and, Through Counsel, Raises Urgent Concerns About the Provision of His Medication

23.     On April 23, 2024, Martin Njoroge, an associate attorney at Sher Tremonte LLP, visited Mr. Goulbourne in the visitation room at the MDC.  Def.'s Ex. 1, at DNJ0064.  Sometime after that meeting, on the same day, Mr. Goulbourne was transferred to the Special Housing Unit ("SHU"), based on a complaint from a nurse that Mr. Goulbourne had reportedly threatened him about withholding his pain medication.  *Id.*[3]

24.     On April 24, 2024, at 3:07 PM, the undersigned counsel sent an email to Ms. Papapetru and Staff Attorney Irene Chan, copying the AUSAs on Mr. Goulbourne's criminal case and Deirdre von Dornum of the Federal Defenders.  The subject line of email was "Urgent: Johnathan Goulbourne, Reg. No. 85735-059."  *Id.*  The text of the email was as follows:

> Sophia and Irene,
>
> I am writing regarding an alarming situation involving my client Jonathan Goulbourne.  I understand that on Sunday the 14th, he started experiencing severe abdominal pain and nausea and reported it to the CO on duty.  He was essentially told to stop complaining.  On Monday the 15th he collapsed and was taken to the hospital.  He was diagnosed with having a ruptured appendix and had surgery the following day.  I understand that last Thursday he was discharged with a prescription for antibiotics and Percocet.  I am told he was given the Percocet until the weekend lockdown when the CO on duty refused to give it him, though he was still in serious pain.  Yesterday my associate visited him, and he asked us to help him get his pain medication.  I am told that after that meeting, Mr. Goulbourne was sent to the SHU because a nurse construed his statement that he would "get his lawyers involved" to get his medicine as a threat.  He has now been in the SHU for more than 24 hours where not only has he not received Percocet but apparently has not received his antibiotics.  As you likely know, a ruptured appendix spreads infection around the body and is potentially **<u>life-threatening</u>** if not treated with surgery **<u>and</u>** antibiotics.  Please get him his antibiotics immediately as he has likely already missed one or two doses.  Please also provide his Percocet twice daily as

---

[3]     The ticket that was the basis for sending Mr. Goulbourne to the SHU was rewritten after defense counsel complained about Mr. Goulbourne's placement in the SHU, *see* May 1, 2024 Hr'g Tr. at 47-50, and was ultimately overturned and expunged by the BOP regional counsel. *See* ECF No. 405.

prescribed.  I would also like you to provide me with his medical records as soon as possible so I can review what has been done.

Thank you,
Noam

*Id.* (emphasis in original).

25.    Defense counsel received no response to this email.  On April 25, 2024, at 9:22 AM, AUSA Tara McGrath replied-all to the email, stating, "If you have not yet responded directly to counsel, please do so as a matter of urgency and copy the government.  Please also confirm that the defendant has received any antibiotics and pain medication which he is prescribed."  *Id.* at DNJ0062.

26.    Following this email, defense counsel received no response.  Accordingly, at the end of the day, at 4:51 PM, defense counsel wrote, "Following up on AUSA McGrath's email, can you please provide confirmation regarding Mr. Goulbourne's medication?  We've had no response so far."  *Id.* at DNJ0061.

27.    The following day, April 26, 2024, AUSA McGrath sent an email indicating she was following up on a telephone call and said, "we are still waiting for confirmation that inmate Jonathan Goulbourne . . . has been receiving his antibiotics and pain medicine following his appendix surgery last week.  **Can you please confirm?**"  *Id.* (emphasis in original).  AUSA McGrath added Ms. Lynch to the email chain one minute later, with a note that said, "Ms. Lynch—please see the urgent request below.  Thank you!"  *Id.*

28.    Shortly thereafter, Ms. Lynch replied to the emails from defense counsel and the government as follows:

Good afternoon,

Per my conversation with medical staff it is my understanding that AIC Goulbourne has received the prescribed antibiotics and pain medication. As the pain medication

6

is a controlled substance, he received that medication from the pill line. The antibiotics were provided to him as self-carry medication.

Additionally, he was seen yesterday by medical staff. Based on their consult with AIC Goulbourne yesterday, it appears his wounds have healed and he was advised to take Tylenol for pain as needed moving forward.

Thank you,

Eliabeth Lynch | Staff Attorney

*Id.* at DNJ0059-60.

29.     Defense counsel responded to this email the same day, stating, in pertinent part:

"While [Mr. Goulburne] technically has his antibiotics and Tylenol, they are in his locke[r] in his unit and he has not been able to access them since he was taken to the SHU.  Accordingly, he has not been able to take any medicine for the last 72 hours." *Id.* at DNJ0059.  The email went on to ask that, by close of business that day, Ms. Lynch confirm that Mr. Goulbourne had his antibiotics "in his <u>actual possession</u>." *Id.* (emphasis in original).  Defense counsel received no response that day.

30.     The following Monday, April 29, 2024, defense counsel followed up again and asked Ms. Lynch to "[p]lease confirm he has his medication in his possession in the SHU." *Id.* at DNJ0058.

31.     The same day, Ms. Lynch wrote the following, in pertinent part:

Per my conversation with medical, it is my understanding that the Percocet prescription expired on 4/21/2024. This was prior to your client being transferred to SHU. The antibiotic medication was completed on 4/24/2024. Therefore, he would not have those in his possession at this time. As previously indicated, he was seen by medical on 4/25/2024 and it was determined he did not need additional antibiotics.

*Id.* at DNJ0057.

32.     Shortly thereafter, defense counsel again wrote to Ms. Lynch explaining that the problem was that Mr. Goulbourne had been transferred to the SHU on April 23 and thus had not

7

been able to complete the course of antibiotics.  Counsel noted that antibiotics needed to be taken until the prescription is completed and asked Ms. Lynch to "please ensure that he receives the remaining doses, or, if you cannot do that, please advise ASAP so I can seek relief from the Court."  *Id.* at DNJ0057.

33.    Neither Ms. Lynch nor any member of the MDC staff ever responded to this email.  Accordingly, on April 30, 2024, Mr. Goulbourne filed an emergency motion with the Court.  ECF No. 330.

**D.  Responses of MDC Legal and Medical Staff to Concerns Raised by Counsel**

34.    Over the course of the week in which counsel and the U.S. Attorney's Office were both raising concerns about Mr. Goulbourne's medication—and repeatedly noting its urgency—MDC officials had internal communications regarding these concerns but did nothing to address them.

**a.  Bruce Bialor**

35.    Dr. Bialor has been a licensed physician since 1990 and has worked at the MDC since September 2015.  He was named acting clinical director in June of 2017 and became permanent in June of 2020.  Hr'g Tr. 14:14-15:5.

36.    As clinical director, Dr. Bialor oversees the entire medical department, consisting of "probably around 20 to 30 " "nurses and pharmacists and medical technicians."  *Id.* at 47:1-4.[4]

37.    Dr. Bialor testified that when he prescribed Mr. Goulbourne a five-day course of antibiotics, he intended that Mr. Goulbourne would take the full course.  *Id.* at 52:13-15.  Indeed, Dr. Bialor testified that it is important that a patient complete a course of antibiotics "because

---

[4]    The MDC employs one other doctor and has had an open position for a third doctor that it has been unable to fill for the nine years that Dr. Bialor has been employed there.  *Id.* at 47:5-49:2.

otherwise there can be lingering bacteria that's not killed off by the antibiotics" and because "if you don't finish a course of antibiotics, that can create antibiotic-resistant bacteria." *Id.* at 52:19-25.

38.     Dr. Bialor stated on direct examination that there were "no consequences" for Mr. Goulbourne in missing a dose of antibiotics because, upon a visual inspection, the "redness [around his incision] had resolved." *Id.* at 33:8-24. In response to questioning from the Court, however, Dr. Bialor admitted that "in all of [his] years of practice," he has never advised a patient to whom he is prescribing antibiotics "to simply discontinue the antibiotics before the prescription has run its course." *Id.* at 64:25-65:4.[5]

39.     On April 24, 2024 at 3:17 PM, eleven minutes after defense counsel sent his initial email raising "[u]rgent" concerns about Mr. Goulbourne's treatment, Staff Attorney Irene Chan forwarded that email to Dr. Bialor, among others. MDCX-P, at DNJ0048. Dr. Bialor did not do anything in response to receiving this email. Hr'g Tr. 75:6-7.

40.     Dr. Bialor testified that he became aware on April 25 that Mr. Goulbourne had been placed in the SHU. *Id.* 78:19-20. However, when he learned that Mr. Goulbourne was asserting that he had not received all his medication in the SHU, Dr. Bialor "didn't do anything specifically" to make sure that Mr. Goulbourne received his medication. *Id.* at 78:22-79:2.

41.     Dr. Bialor was unaware of any policy as to whether inmates' self-carry medication should be transferred with them to the SHU or to another housing unit if they are moved. Instead, he said, "I know that's the way we've been operating all these years, that they're supposed to go – self-carry meds are supposed to go with them to [the] SHU." *Id.* at 51:23-25.

---

[5]     Dr. Bialor also testified, on cross-examination, that "ongoing pain" (which Mr. Goulbourne continued to experience at the time of his April 25, 2024 clinical encounter, *see* MDCX-J) is a "common sign[] of infection." Hr'g Tr. 53:2-14.

42.     Dr. Bialor further testified that "the pharmacy is usually notified when someone gets moved to SHU.  So, pharmacy would be the ones that would make sure" that Mr. Goulbourne received his medication.  *Id.* at 79:13-15.  On further questioning from the Court regarding the responsibility of the pharmacy to ensure the delivery of medication, Dr. Bialor testified that "[t]hat's the way they would usually handle it" and the "pharmacy is normally involved when people get moved to SHU."  *Id.* at 80:2-23.

43.     When the Court asked "whether any efforts were made at the time to have a pharmacist reissue any medications for Mr. Goulbourne," Dr. Bialor stated that he was not aware of any such efforts.  *Id.* at 89:4-10.

44.     When the Court asked, "But the medical staff, in terms of doctors and nurses, are not responsible and involved in ensuring that individuals placed in the SHU have their medication?" Dr. Bialor (who, as clinical director, oversees the entire medical staff) stated, "I'm sure that there probably is one – some other staff member.  There is a lot of things that I – I can't – I don't want to make something up."  *Id.* at 81:1-7.

45.     Between April 24 and May 1, 2024, Dr. Bialor became aware that defense counsel and, subsequently, the Court were inquiring about the provision of Mr. Goulbourne's medication in the SHU.  *Id.* at 83:18-23.  Dr. Bialor testified that he was not aware at the time that anyone from the MDC had informed defense counsel that Mr. Goulbourne had received his antibiotics in the SHU.  *Id.* at 87:16-23.  As of the Hearing, however, Dr. Bialor understood that this information had been communicated and was untrue.  *Id.* at 88:2-5.

46.     Dr. Bialor stated that he had no understanding at the time of the Hearing as to how his staff members had concluded that Mr. Goulbourne had been provided with his antibiotics

while he was in the SHU, and he never made any inquiries of his staff as to why they reported this false information to defense counsel.  *Id.* at 88:6-15.

### b.  Marilyn Garcia

47.     Ms. Garcia is a registered nurse who has worked at the MDC since November 2013.  *Id.* at 99:12-23.

48.     Ms. Garcia met with Mr. Goulbourne while she was doing her SHU rounds on April 25.  *Id.* at 112:1-5.  Mr. Goulbourne complained to Ms. Garcia of still being in the same level of pain at that time that he was experiencing a week prior when he returned from the hospital.  *Id.* at 113:22-24, 123:21-124:2.

49.     In the April 25 clinical encounter, Ms. Garcia did not make any determinations concerning Mr. Goulbourne's antibiotics.  *Id.* at 120-122.  She testified that he did not mention to her in that meeting that he did not have his antibiotics.  *Id.* at 115:1-2.  She was, however, "notified by the lawyer that – that his main complaint was that he didn't receive his antibiotic[s]," but could not recall when she was notified of that.  *Id.* at 115:8-15.

50.     When asked about MDC policy and practice with respect to identifying for each inmate which medication he or she is on so that the MDC can "affirmatively ensure" that the inmate has the medication, Ms. Garcia affirmed that "the inmate must report" that information to her and that is what "usually" occurs, but she is not "instructed to inquire" about inmates' medication.  *Id.* at 117:7-16.

### c.  Blake Glucksnis

51.     Mr. Glucksnis is an assistant health services administrator at the MDC, where he has worked for two-and-a-half years.  Prior to that, he was a paramedic at the United States

11

Penitentiary in Canaan, Pennsylvania and an EMT for over twenty years. *Id.* at 127:14-128:7.

Part of Mr. Glucksnis's job is "replying to legal concerns." *Id.* at 128:10.

52.     Mr. Glucksnis was also copied on Irene Chan's forward of defense counsel's

"[u]rgent" April 24, 2024 email raising concerns about Mr. Goulbourne's medical care. MDCX-

P, at DNJ0048. When asked what he did in response to Ms. Chan's email, Mr. Glucksnis stated,

"I don't believe I read it[. ] I don't know if I wasn't there that day or what the specifics were."

*Id.* at 148:19-23.

53.     On April 26, at 1:58 PM, Ms. Papapetru forwarded Mr. Glucksnis an email chain

that included defense counsel's original April 24, 2024 email and follow-up emails from AUSA

McGrath and defense counsel. MDCX-Q, at DNJ0013. Ms. Papapetru stated, "Please see below

and please assist Liz asap." *Id.*

54.     In response, Mr. Glucksnis sent an email on April 26, 2024, at 2:37 PM. *Id.,* at

DNJ0012. As to Mr. Goulbourne's antibiotics, Mr. Glucksnis stated, "Penultimately, his

antibiotics expired on 4/24 and when he was seen on the 25th, there was [*sic*] no indications of

any infection so there is no need for additional ones." *Id.* In addition, Mr. Glucksnis stated in

that email, "Finally, since his appendix was literally removed from his body starting this whole

incident, I have little concern if it bursts now as it is probably sitting in a medical waste box not

bothering anyone anymore." *Id.*

55.     At the Hearing, Mr. Glucksnis testified that when an inmate is transferred to the

SHU, "what's supposed to happen" is that the inmate brings his self-carry medication with him,

or the pharmacy will issue a new prescription. *Id.* at 133:10-17. He did not know, however,

whether there is any written policy by the MDC or the Bureau of Prisons ("BOP") regarding this

practice, *id.* at 133:18-25, and, other than an inmate's self-reporting, Mr. Glucksnis testified that

there is "no mechanism that automatically will notify [medical staff] that this inmate with these medications has gone to the special housing unit" and ensure that the inmate would receive his medication. *Id.* at 135:14-16.

56.    With respect to his email of April 26, 2024, in response to questioning from the Court, Mr. Glucksnis admitted that in "the email [from defense counsel] that was forwarded" to him to which he was responding, "the question that was asked was not what [Mr. Goulbourne] was prescribed but whether he received it . . . in the SHU." *Id.* at 138:15-139:9.

57.    Mr. Glucksnis testified that, in drafting his response, he "for the most part, relied upon [Mr. Goulbourne's] medical records." H'rg Tr. 137:1-2.  The Court then asked him, "Do the medical records indicate whether the medication was provided to him after he had been placed in the SHU?" to which Mr. Glucksnis replied, "It – it doesn't reference it at all." *Id.* at 139:6-9.

58.    Other than the medical records, Mr. Glucksnis did not "look at anything else to confirm that [Mr. Goulbourne] had received his medication after he was placed in the SHU." *Id.* at 139:19-22.  He did not "inquire of anyone in response to Ms. Papapetru's email as to whether Mr. Goulbourne had been provided his antibiotics after he was placed in the SHU." *Id.* at 139:23-140:1.  Instead, Mr. Glucksnis simply "assume[d] that [Mr. Goulbourne] carried his antibiotics to [the SHU] with him." *Id.* at 140:16-18.[6]

---

[6]    In response to the Court's questioning regarding Mr. Glucksnis's writing in his April 26, 2024 email that he had "little concern" if Mr. Goulbourne's appendix burst as it was "probably sitting in a medical waste box not bothering anyone anymore," MDCX-Q, at DNJ0012, Mr. Glucksnis testified, "That was just snark for the most part but it's not inaccurate.  I mean, he had his appendix removed." *Id.* at 150:20-21.  When asked whether he thought that was an appropriate response to an urgent email regarding "the care of an individual in [his] charge," Mr. Glucksnis replied, "Well, I usually rely on legal to translate my snark out of the emails when they forward it back onto the[] attorneys." *Id.* at 150:23-151:3.

59.     On April 29, 2024, Mr. Glucksnis again represented to Ms. Papapetru that Mr. Goulbourne had received his antibiotics after he was placed in the SHU.  When asked by the Court about this additional representation, Mr. Glucksnis responded, "I don't believe I was taking into account that he was in SHU. . . .  I was just . . . answering the question had he received  . . . his antibiotics."  *Id.* at 149:7-13.

60.     Mr. Glucksnis then stated that he did not read defense counsel's email closely.  *Id.* at 149:14-15.  The Court then asked him whether "the urgent at the top of the email didn't prompt you to read it closely," to which Mr. Glucksnis responded, "I mean, it did. . . . I thought I read it closely."  *Id.* at 149:19-24.

61.     On May 1, 2024, Ms. Papapetru appeared in court and spoke with Mr. Glucksnis by phone during a break in the proceedings.  Mr. Glucksnis testified that the subject of that conversation was "I believe the antibiotics."  *Id.* at 143:12.

62.     When asked if the representations he made to Ms. Papapetru were true as he knew them at the time, Mr. Glucksnis responded, "See, I answered the question, was he issued all of his medication, which is true, he was.  I may have misheard the conversation, but that was the question I interpreted.  Was he issued all of his antibiotics.  Yes."  *Id.* at 144:20-23.  When pressed further by the Court whether he understood the concern of defense counsel and Ms. Papapetru to be "simply was he issued" the antibiotics, Mr. Glucksnis testified, "I may or may not have understood it as that.  I don't believe so."  *Id.* at 145:8-9.

63.     Finally, at the beginning of his testimony, Mr. Glucksnis, who affirmed that he had "about 25 years of experience in the health industry," testified that Mr. Goulbourne's treatment was "all appropriate."  *Id.* at 127:19-21, 129:12.  Toward the end of his testimony, the Court returned to this comment and asked, "In your opinion, is not providing the entire course of

14

an antibiotic treatment to any patient appropriate?"  Mr. Glucksnis responded, "I mean, if the

infection has resolved, then yes."  *Id.* at 151:20.  When pressed by the Court, however, Mr.

Glucksnis admitted that he had never advised a patient to discontinue antibiotics before the

prescription had been completed and there was no indication in this case that a doctor had

advised Mr. Goulbourne to discontinue antibiotics before April 24.  *Id.* at 152:1-16.

### d.  Elizabeth Lynch

64.     Ms. Lynch is a staff attorney in the MDC Legal Department.  She graduated from

Brooklyn Law School in 2020.  Prior to starting in this position on April 8, 2024, she was an

assistant district attorney in Suffolk County for approximately three and a half years.  *Id.* at

155:21-156:19.

65.     In her first two weeks as a Bureau of Prisons employee, Ms. Lynch received no

training about her "roles and responsibilities . . . as a BOP staff attorney," no "training on how to

go about responding to inquiries from defense counsel," and no "training regarding how to

respond to inquiries regarding medical matters" or "inquiries related to medication inmates might

be prescribed."  *Id.* at 157:14-158:1.

66.     Ms. Lynch's first day working in the legal department was April 24, 2024, the day

that defense counsel sent his urgent email regarding Mr. Goulbourne's medical care.  *Id.* at

158:5-6.

67.     Her only training that day consisted of Ms. Papapetru telling her to "review the

emails I had been copied on to see what types of inquiries we see in the legal department, review

them, see how to respond and who to forward the emails to get the information from."  *Id.* at

158:7-10.  Other than this directive, Ms. Lynch was given a copy of the Attorney Access Guide

to MDC Brooklyn, which did "[n]ot particularly" give her any "guidance on how to perform [her] job." *Id.* at 159:9-15.

68.    Ms. Lynch's work hours were 7:30 AM to 3:30 PM and, she testified, she did not have access to her work email when she was not in the office. *Id.* at 161:18-162:1. Ms. Papapetru, however, has access to her work email at all times by virtue of having a BOP-issued cellphone. *Id.* at 217:14-23.

69.    On April 24, 2024, Irene Chan copied Ms. Lynch when she forwarded defense counsel's "urgent" email regarding Mr. Goulbourne's medical care. MDCX-P. Ms. Lynch reviewed the email either that same day or the following day, April 25. Hr'g Tr. 162:15-16. She did not do anything in response to the email; her understanding of her responsibility was only "to review the entire email chain to see and learn." *Id.* at 163:21-22.

70.    On April 26, 2024, Ms. Lynch was the only person from the legal staff in the office because, she testified, Ms. Papapetru left between 8:00 and 9:00 AM to make sure that a person on her staff who had experienced a medical emergency was okay. *Id.* at 169:20-24.

71.    Later that afternoon, Ms. Papapetru called Ms. Lynch and told her she was forwarding her an email, "that it was urgent, and I needed to respond as soon as possible." *Id.* at 170:6-9. Ms. Papapetru did not provide any additional information or direction to Ms. Lynch. *Id.* at 170:10-12.

72.    Ms. Papapetru then forwarded Ms. Lynch an email chain that included defense counsel's April 24, 2024 email and follow-up from April 25. MDCX-Q, at DNJ0013.

73.    As noted above, included in counsel's email were the following two sentences: "[Mr. Goulbourne] *has now been in the SHU for more than 24 hours* where not only has he not received Percocet but apparently has not received his antibiotics"; "Please get him his antibiotics

16

immediately as *he has likely already missed one or two doses*." *Id.* at DNJ0015 (emphasis added). Ms. Lynch testified, however, "When I read the email . . . to me, what came across was that he had not received his antibiotics or Percocet at all." Hr'g Tr. 174:5-7.

74.     When directed to it by the Court, Ms. Lynch conceded that she had read the sentence about Mr. Goulbourne having been in the SHU, but nevertheless testified, "I read it that he didn't have the medication at all.  I didn't focus on the SHU portion." *Id.* at 174:18-19.

75.     Ms. Lynch testified that she then proceeded to search her email chain between Ms. Chan and the pharmacy department, MDCX-P, and testified that she believed based on that email chain she had "sufficient information" to respond to defense counsel's email. *Id.* at 176:7-10.

76.     Ms. Lynch did not contact anyone from the pharmacy department, or the medical department writ large, to confirm the information in the email.  Indeed, she did not "make any effort to confirm that Mr. Goulbourne had, in fact, received the medication, independent of the emails." *Id.* at 178:22-179:1.[7]

77.     Having done nothing besides reviewing an email chain, Ms. Lynch wrote back to counsel, "Per my conversation with medical staff, it is my understanding that [Mr.] Goulbourne has received the prescribed antibiotics and pain medication."  MDCX-R, at DNJ0002.  When asked why she wrote "[p]er my conversation with medical staff," despite not having any such conversation, Ms. Lynch testified, "That was my way of conveying that I received the information from another source."  Hr'g Tr. 178:5-9.

---

[7]     The Court had to press Ms. Lynch repeatedly on what, if any, steps she took to confirm the information, before she ultimately admitted she took none.  *Id.* at 178:10-179:4.

17

78.    With respect to Mr. Goulbourne's pain medication, Ms. Lynch testified that she understood counsel's complaint to be that Mr. Goulbourne "had not received it at all." *Id.* at 180:10.  When the Court pointed Ms. Lynch to the sentence in counsel's email that said "I'm told he was given Percocet until the [weekend] [] lockdown," Ms. Lynch changed her testimony, stating that she understood the email to be saying "[n]ot that he never received it, but that he hadn't received much of the medication." *Id.* at 180:20-181:4.

79.    The pharmacy department's emails that Ms. Lynch reviewed had, in fact, indicated that Mr. Goulbourne missed a dose of Percocet, MDCX-P; nonetheless, when confronted with this email, Ms. Lynch testified that she believed her email stating that Mr. Goulbourne had received his pain medication was "accurate, based on the information I had." *Id.* at 222:18-223:1.

80.    As to the antibiotics, Ms. Lynch testified that she understood from counsel's April 24 email that "defense counsel was under the impression [Mr. Goulbourne] missed his antibiotic doses," *id.* at 182:19-20, but she understood from the correspondence with the pharmacy department that he had, in fact, received all his doses because the pharmacy stated, "treatment completed." *Id.* at 183:16-17.  She did not inquire any further and did not think she needed to do any follow up to be able to respond to defense counsel's inquiry. *Id.* at 183:18-23, 184:9-10; *accord id.* at 188:7-10 ("THE COURT:  [T]he emails . . . don't say anything about missed doses. You didn't inquire specifically about missed doses?  THE WITNESS:  Specifically, no.").

81.    Defense counsel replied to Ms. Lynch's response at 3:12 PM, clarifying that while Mr. Goulbourne was given his antibiotics as self-carry medication, he did not have the medicine with him in the SHU.  MDCX-V, at DNJ0016.  Ms. Lynch testified that she did not see that email on April 26 because she was not at her desk.  Hr'g Tr.  191:9-13.  She testified, "I believed that

the one urgent thing I was tasked with responding to I had responded fully and I had received the out of office [message] from defense counsel, so I did not believe I would be receiving any follow-up." *Id.* at 191:20-23.  So, she went home for the weekend.[8]

82.    The out of office email on which Ms. Lynch relied to determine she would not be receiving any more follow-up stated, "I am on vacation the week of April 22," and thus indicated counsel was sending the emails regarding Mr. Goulbourne's medical care despite being on vacation.  MDCX-S.[9]

83.    Defense counsel's out of office email (which retained the word "Urgent" in the subject line) also provided a phone number for counsel's partner and indicated she could be reached in case of emergency.  *Id.*  Ms. Lynch decided not to call that phone number.  Hr'g Tr. 238:14-17.  She did not consult with any of her supervisors about whether to call that number because, she stated, she was "the only one in the office that day"—her third day on the job.  *Id.* at 238:18-20.

84.    The following Monday, April 29, Ms. Lynch arrived at work and reviewed counsel's email from 3:12 PM on April 26, as well as a follow-up email from that morning.  *Id.* at 193:16-20.  Ms. Lynch had a discussion with Ms. Chan, who was in the office that day, and they decided that Ms. Lynch should respond since she had been the one to respond to counsel's previous email.  *Id.* at 194:6-12.

85.    At this point, Ms. Lynch understood counsel's inquiry to be about "whether or not [Mr. Goulbourne] had his medication in the SHU." *Id.* at 194:16.  She relied, however, on an

---

[8]    As she testified, Ms. Lynch did not have access to her work emails over the weekend, but Ms. Papapetru, who was copied on all of defense counsel's emails, did.

[9]    Ms. Lynch also received an out of office email from defense counsel's associate, which indicated he was in a client meeting but could be reached on his cellphone.  MDCX-T.

email from Calvin Truong in the pharmacy department that incorrectly stated that Mr. Goulbourne had been sent to the SHU on April 24 and, thus, had "received and been able to take every dose, if taken correctly." *Id.* at 196:10-11.

86.    When asked by the Court whether she made any effort to reconcile the information provided by the medical department and the information provided by defense counsel—including that *on April 24*, Mr. Goulbourne had already "been in the SHU for more than 24 hours", MDX-V, at DNJ0020—Ms. Lynch testified, "I didn't believe there was an inconsistency in the information." Hr'g Tr. 196:24-25.  She then clarified that she did not see an inconsistency in "[w]hat I received from medical." *Id.* at 197:6.

87.    When pressed by the Court about how she could reconcile the information provided by medical and the complaint from counsel, Ms. Lynch finally testified, "I believed that Mr. Biale was incorrect in the amount of time that his client was in the SHU." *Id.* at 199:13-15. On further questioning, she conceded that she did not do anything to confirm whether defense counsel was incorrect and medical was correct because, she said, "I believed the information medical provided." *Id.* at 199:20-21.  Ms. Lynch later testified that "there is a record maintained of when someone is placed in the SHU irrespective of medical treatment," but she made no effort to use that system to ascertain when Mr. Goulbourne was placed in the SHU because she "didn't know that I could access that specific program." *Id.* at 206:18-24, 208:9-10.  She did not ask any of her supervisors how to access that information, and no one senior to her provided her with that information. *Id.* at 208:7-209:10; *see also id.* at 210:21-25 ("THE COURT:  And nobody offered that information to you, correct?  THE WITNESS:  Not at that time.  THE COURT:  And you didn't ask, correct?  THE WITNESS:  Correct.").

20

88.     Based on the inaccurate information Ms. Lynch received from the pharmacy department, she drafted an email response to defense counsel and asked Ms. Chan to review it prior to her sending it.  *Id.* at 201:11-12.  That email again stated that Ms. Lynch's information was "[p]er my conversation with medical," MDCX-Y, at DNJ0029, though she had not, in fact, had a conversation with anyone from medical.

89.     That same day, defense counsel replied to Ms. Lynch and again stated that Mr. Goulbourne "was transferred to the SHU on 4/23" and explained the health risks of not being able to finish a course of antibiotics.  *Id.* at DNJ0028.  Ms. Lynch testified that based on this email she "wasn't sure where counsel was receiving the information" but she "still believed medical was accurate."  Hr'g Tr. 204:6-10.  She again made no effort to confirm the information that the medical staff had provided to her.  *Id.* at 204:23-25.

90.     Instead, she and Ms. Chan "had a conversation and after that conversation, we discussed that we should speak with Ms. Papapetru the next day when she came in."  *Id.* at 204:10-13.  She did not try to call Ms. Papapetru, even though Ms. Papapetru had access to her BOP e-mail and phone even when out of the office.  *Id.* at 227:14-21.  Rather, she determined on her own (or in discussion with Ms. Chan), "I didn't believe there was a need for me to call Ms. Papapetru on her day off on something that I thought had been resolved."  *Id.* at 235:10-12.

91.     When pressed by the Court whether, notwithstanding counsel's follow-up email, she determined that the matter was no longer urgent "and therefore you didn't want to bother Ms. Papapetru on her day off," Ms. Lynch (who did not testify that she had any training in when something is or is not a medical emergency) stated, "I would still say it was urgent, I didn't think it was an emergency."  *Id.* at 235:22-236:9.

92.     The next day, April 30, Ms. Lynch discussed counsel's emails with Ms. Papapetru. *Id.* at 211:14-23.  Ms. Lynch could not recall whether she raised the issue with Ms. Papapetru "at the first opportunity available," but, rather, she "discussed it with her at some point that day."  *Id.* at 212:3-7.

93.     Ms. Papapetru told her she would reach out to the captains and "handle it moving forward."  *Id.* at 212:1-2.  Neither Ms. Lynch, nor anyone from the legal department ever responded to defense counsel's email of April 29.  *Id.* at 228:5-18.

94.     At 3:11 PM on April 30, Ms. Papapetru sent an email, which copied Ms. Lynch and expressly removed defense counsel.  MDCX-Z, at DNJ0038.  In that email, Ms. Papapetru stated, "Pending information from the Captains as to whether we can identify if his antibiotics were in fact brought to SHU with him."  *Id.*  When confronted with that email, Ms. Lynch testified, "At that point that was the first indication that I had that it may not have been brought to SHU with him."  Hr'g Tr. 240:23-25.

95.     The Court twice asked Ms. Lynch about whether defense counsel's prior emails—including the one she had previously testified she understood was about "whether or not [Mr. Goulbourne] had his medication in the SHU," *id.* at 194:16—indicated to her that Mr. Goulbourne had not received his antibiotics in the SHU.  *Id.* at 241:1-5.  She twice affirmed that those emails gave her no such understanding and that her first indication that Mr. Goulbourne had not received the medication was Ms. Papapetru's email of April 30.  *Id.* at 241:6-10.

**E.  The Court's Inquiries and May 1, 2024 Hearing**

96.     After putting the MDC legal department on notice that he would have to file an emergency motion for relief if they did not provide any more information—and no one from the

legal department responded to his email—counsel filed his emergency motion on April 30, 2024. ECF No. 330.

97.    The Court that same day followed up with Ms. Papapetru and AUSA McGrath and "asked in no uncertain [terms], indeed, I confirmed that I wanted an update by 5:15 p.m. concerning the provision of Mr. Goulbourne's antibiotics." May 1, 2024 Hr'g Tr. 7:13-16. No one responded to the Court by 5:15; instead, at some point around 5:25 or 5:30 the government advised the Court "that MDC staff was trying to locate the medication that was taken from Mr. Goulbourne at the time he was placed in the SHU." *Id.* at 8:1-3.

98.    The government then sent the Court a letter at 6:22 PM, ECF No. 331, that advised that MDC legal staff had spoken to the medical staff and had learned that Mr. Goulbourne was seen on April 25 and it was determined that he no longer needed antibiotics because his wounds were "healing well," and thus no further treatment was required "irrespective of whether he had completed his prior five-day treatment." May 1, 2024 Hr'g Tr. at 9:16-24.

99.    The Court then issued an order to show cause and the parties, along with Ms. Papapetru, appeared before the Court on May 1, 2024. *See generally id.*

100.    During that conference, Ms. Papapetru stated that the reason the facts as reported were irreconcilable with each other was that "[t]he medical staff" had lied to her. *Id.* at 24:20-21. She was asked "[w]hich specific medical staff lied to you?" *Id.* at 24:23-24. The Court then took a recess during which Ms. Papapetru reviewed the emails and spoke with Mr. Glucksnis. She then returned and reported to the Court that "Ms. Lynch inquired as to the provision of Mr. Goulbourne's medication" and that Mr. Glucksnis "provided false information [to Ms. Lynch] concerning the provision of antibiotics to Mr. Goulbourne." *Id.* at 25:19-26:20.

101.    In fact, however, as discussed above, Ms. Lynch made no inquires beyond reviewing emails from the pharmacy department, never spoke to Mr. Glucksnis, and responded to defense counsel before Mr. Glucksnis sent his email on April 26, 2024.

102.    Ms. Lynch read the transcript of the May 1, 2024 hearing close in time to when it occurred.  Hr'g Tr. 214:6-13.  She noted that Ms. Papapetru "must have been mistaken" about Mr. Glucksnis speaking with her on April 26 and that she "spoke to him a second time before the exchange with Mr. Biale on the 29th as well."  *Id.* at 213:3-10.  Between May 1, 2024 and January 13, 2025, when she testified, neither Ms. Lynch, nor anyone from the MDC legal department, ever reached out to the Court to correct the record.

103.    To date, Ms. Papapetru has not corrected her misrepresentations.

## CONCLUSION

Accordingly, the Court should adopt the foregoing proposed findings of fact, including making appropriate findings as to credibility, and impose necessary sanctions for (a) misrepresentations to defense counsel and the Court; (b) the woefully inadequate policies, procedures, and training related to medical care at the MDC; and (c) the casual disregard by MDC staff for the health and safety of individuals in their care, both directly and in interactions with their counsel.

Dated: April 1, 2025
New York, NY

SHER TREMONTE LLP

By: */s/Noam Biale*
Noam Biale
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
E-mail: nbiale@shertremonte.com

*Attorneys for Jonathan Goulbourne*

24